

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-3-2009

# USA v. Price

Precedential or Non-Precedential: Precedential

Docket No. 06-4503

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"USA v. Price" (2009). *2009 Decisions.* Paper 1633.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1633

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-4503
_____

UNITED STATES OF AMERICA

v.

JOHN JOSEPH PRICE, JR.,

Appellant.

_____

On Appeal from the United Stated District Court
for the Western District of Pennsylvania
(D.C. Crim. No. 04-cv-0050E)
District Judge:  Hon. Sean J. McLaughlin

_____

Argued January 31, 2008

Before:  RENDELL and CHAGARES, Circuit Judges, and
POLLAK, District Judge.*

Filed: March 3, 2009

_____

_____
          * The Honorable Louis H. Pollak, Senior Judge of the
United States District Court for the Eastern District of
Pennsylvania, sitting by designation.

Candace Cain (Argued)
Lisa B. Freeland
1450 Liberty Center
1001 Liberty Avenue
Pittsburgh, PA 15222
Counsel for Appellant

Rebecca R. Haywood (Argued)
Mary Beth Buchanan
United States Attorney's Office for the
Western District of Pennsylvania
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
Counsel for Appellee

_____

OPINION OF THE COURT

_____


CHAGARES, Circuit Judge.

John Joseph Price, Jr. entered a conditional plea of guilty to methamphetamine manufacturing and possession and now appeals two aspects of his proceedings. First, he argues that the District Court erred in refusing to suppress evidence because the Government violated his Fourth Amendment rights. In particular, Price contends that a consent to search his house was not voluntary and that evidence seized from his basement pursuant to a later-obtained warrant should be suppressed. Second, Price argues that notwithstanding his waiver of appeal, the Government abused its discretion by refusing to request an additional offense level reduction of one point for acceptance of responsibility under § 3E1.1(b) of the Sentencing Guidelines. Because we agree with the District Court's decisions regarding the motion to suppress and its sentence, we will affirm.

I.

2

## A.

On April 5, 2002, Price sold approximately 1/4 gram of methamphetamine to Randall Schirra, an undercover agent with the Pennsylvania Attorney General's office. As a result of this sale, the Commonwealth issued a warrant for Price's arrest, but he eluded capture for more than two years. On October 5, 2004, Price's luck ran out, for on that date, law enforcement officers from both the Attorney General's office and the Pennsylvania State Police went to Price's place of work – a garage off of Route 97 in Erie, PA. Schirra had source information that Price would be there.

The agents found Price in a small office near the back of the garage. They handcuffed him and removed him from the building. A search of Price conducted incident to the arrest revealed "items indicative of methamphetamine trafficking, including plastic baggies with methamphetamine residue and pH papers used to gauge the acidity of the methamphetamine production process." Appendix (App.) 61.

## B.

Outside the garage, Price told Schirra that he was supposed to pick up his kids, and since his wife was working, the children would be home alone. Price lived with his common-law wife, Debbie Fischer, and two children (a girl, age 14, the daughter of Price, and a boy, age 9, the son of Price and Fischer) at 8350 Page Road in Wattsburg, Pennsylvania. Schirra testified at the suppression hearing that he told Price that officers would "check on the childrens['] safety [and] contact his wife." App. 132. Schirra also testified, however, that he wanted to get consent to search the Page Road residence to see if Price operated a methamphetamine lab there. The officers had "quite a bit of information gleaned from sources, unidentified informants and concerned citizens about Mr. Price's involvement in methamphetamine" at the Page Road residence. App. 152.

Leaving Price in the custody of a state trooper, Schirra and two other state officers, Trooper Ron Wilson and Agent Tim Albeck, drove to Price's Page Road residence. The two children answered Schirra's knock on the door and confirmed that no adult was home. They gave the officers Fischer's number at work.

3

Wilson called Fischer, and she drove home from work to the house. On her way home, Fischer ran out of gas, so Albeck picked her up and brought her to the house.

## C.

More officers arrived on the scene, but Schirra and Wilson had those officers stay down the road, away from the Page Road residence, so that only three or four officers were present when Schirra, Wilson, and Fischer first conversed in the driveway/front yard area of the home. Wilson testified that they minimize the number of officers on the scene "so that . . . the people are not overwhelmed with law enforcement's presence whenever they give or do not give consent. So it's not – so that they're more relaxed and they don't feel coerced at all." App. 174.

Schirra and Wilson explained to Fischer that Price had been arrested, and that the authorities "had prior information that Mr. Price was involved in manufacturing methamphetamine at the residence. And that we would like to have consent to search to make sure it was a safe environment for her and her children." App. 113. Wilson also mentioned that the agents had information that there was a stolen All Terrain Vehicle (ATV) on the premises.

These were the only reasons the officers gave Fischer for why they wanted to search the house and property – to protect the safety of her and her children from any methamphetamine production, and to look for the ATV. The officers did not tell Fischer that she had the right to not consent, did not tell her that anything found could incriminate her or Price, and did not present her with a written consent form (which included all of that information). Schirra did not present Fischer with a written consent form because, in his words, "I didn't have one on me."[1] App. 122.

Without hesitation, Fischer verbally consented to having the agents look around the house and the property. Fischer did not appear to be under the influence of drugs or alcohol, seemed to understand what the officers were telling her, and did not appear

---

[1] Schirra did not have a consent form with him because he works undercover – as does Agent Wilson – and so it is critical not to have any police-related paperwork in their respective cars.

4

especially agitated or afraid. Schirra observed that "she was a little nervous," but "relatively normal." App. 161.

Schirra followed Fischer into the house. Wilson remained outside, and began walking around the curtilage, looking for the ATV. He eventually found the stolen four-wheeled vehicle under a pile of car seats and covers near an outbuilding.

D.

Just off of the living room, as one entered the house, was a room with a padlock on the door. Fischer explained that she and Price slept in this room. Schirra asked Fischer if she had a key. She answered affirmatively, produced a key, and unlocked the door. As she did so, Fischer told Schirra that she and Price used methamphetamine (but did not manufacture it), and that there "might be some pipes" in the bedroom. App. 115. Schirra searched the room and found two glass pipes and a baggie containing sodium hypophosphite in the drawers of a nightstand near the bed.[2] "At that point," Schirra testified, "she asked me to stop searching the house part. Because we found that stuff and she

_____

[2] Sodium hypophosphite is a salt of hypophosphorous acid. Its legitimate uses include electroless nickel plating, fire retardation, and the catalysis of polymers. But many methamphetamine producers also use phosphorus chemicals – most commonly red phosphorous, but also white phosphorous or hypophosphorous acids like sodium hypophosphite – as catalysts in the conversion of ephedrine or pseudoephedrine to methamphetamine precursor, which is one step in the process of methamphetamine production. As compared to red phosphorous, "white phosphorus and hypophosphorous acid methods of illicit methamphetamine production are significantly more hazardous . . . . The hypophosphorous acid method is . . . extremely hazardous since it produces phosphine gas. If not confined within the reaction vessel, ingestion of this poisonous gas can result in death." Control of Red Phosphorus, White Phosphorus and Hypophosphorous Acid (and Its Salts) as List I Chemicals, 65 Fed. Reg. 57577, 57578 (proposed Sept. 25, 2000) (to be codified at 21 C.F.R. pt. 1310).

5

thought she was going to get in trouble."[3]  App. 117.

Schirra obliged, and left the house.  His "prior information about Mr. Price's manufacturing methamphetamine," however, "always said [Price] was cooking in the garage, in the basement area of the home."  App. 124.  Therefore, as he was leaving the house, he asked Fischer how one could get to the basement. Fischer replied that there was no access to the basement from within the house and then "asked [Schirra] to follow her outside." App. 126.  As the two walked around the side of the house, they reconnected with Wilson.

E.

Schirra asked if Fischer would give the agents consent to search the basement.  Without responding verbally, Fischer "directed [the officers] down to the side of the house where you get into the basement . . . and she said that she didn't have the key for it, that only Mr. Price had the key for it."  App. 117-18.  Schirra again asked if the agents "could [] have permission to search the basement.  She said if you could get in, you could search it, but she had no key to get in."  App. 126.  Fischer added that she did not want them to "do any damage to the doors."  App. 118.  Wilson testified that Fischer did not hesitate to offer consent for him to pick the lock because "I wouldn't have gone in if she had" hesitated.  App. 161.

Although she did not have a key, Fischer indicated to the agents that she used the basement to do laundry, and that the family stored various items, such as Christmas decorations, in the basement. App. 146.  Schirra did not ask Fischer how she accessed the basement if she did not own a key.  He was not sure if she ever possessed a key and just did not have it that day, or if she never had a key.

Wilson then picked the lock of the basement door with a

---

[3] Fischer's exact words at this point are the subject of some dispute.  Although Schirra twice said that she asked him to stop searching "the house part," he amended that later, saying that Fischer asked him to stop searching only the drawers of the nightstand.  App. 141-42.

pocketknife, entered the basement briefly, and came out. Wilson only went "a half dozen steps in . . . [j]ust to make sure that it was secure, that it was safe. So that somebody wasn't hiding in there with a gun." App. 172. Schirra entered the basement after Wilson exited. Immediately inside, on the right, lay an open bag containing numerous Sudafed blister packets, as well as "some other chemicals and items that were used in the manufacture of methamphetamine." App. 119. Schirra exited the basement, and told Fischer that she and the children had to leave the house "because it was a [] potential hazard for the kids because there was [sic] chemicals in there." App. 120. He also recommended that Fischer and the children seek medical treatment.

Schirra then asked Fischer to sign a written consent form. She refused. Schirra stated that he asked Fischer to sign a form after going into the basement "[b]ecause other officers had arrived [who] had written consents on their person." App. 122. Moreover, the signed form would have "save[d] me time . . . . It's faster for me to react to a hazardous area with a consent search than applying [for] and obtaining a search warrant." App. 149. If Fischer had signed the consent form, Schirra would have "felt comfortable securing the residence and treating the hazardous environment immediately, rather than having to wait such a long time to obtain a search warrant." App. 122. Because Fischer did not consent, however, Schirra posted officers outside the house and left to apply for a search warrant.

F.

A Magistrate Judge issued a warrant at 2:10 a.m. on October 6, 2004 after reviewing Schirra's Application and Affidavit for Search Warrant (warrant application). The warrant applied to "a one story single family ranch style residence with a basement and garage accessible from the outside" at "8350 Page Road, Wattsburg." App. 53. It permitted a search for "[m]ethamphetamine and any other illegal controlled substance, any and all devices used to store, manufacture, and/or ingest methamphetamine or any controlled substance"; "[c]hemicals, laboratory equipment and other apparatus used in the production, storage or transportation of methamphetamine, listed chemicals and other controlled substances"; any documents relating to controlled substance transactions; and any type of firearms. App. 56.

7

G.

The police returned to the Page Road residence later the same day and seized numerous chemicals related to methamphetamine manufacture from the basement, including 671 grams of sodium hypophosphite. On November 9, 2004, a grand jury indicted Price on seven counts relating to the manufacture and possession of methamphetamine. On May 4, 2006, after a hearing on Price's motion to suppress the fruits of the search, the District Court granted the motion in part[4] and denied it in part. On June 16, 2006, Price entered a conditional plea of guilty to Count One of the indictment, reserving the right to appeal the denied portion of his suppression motion to this Court.

The Presentence Report calculated Price's Base Offense Level at 28. After a two-level downward adjustment for acceptance of responsibility, Price's Total Offense Level was 26. This offense level, combined with a criminal history category of V, produced a Guidelines range of 110-137 months. On October 10, 2006, the District Court sentenced Price to 115 months of imprisonment. This appeal followed.

II.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. Because Price is appealing from a final judgment of conviction and from the District Court's suppression decision, on which there is nothing further to be done, we have jurisdiction pursuant to 28 U.S.C. § 1291. See Flanagan v. United States, 465 U.S. 259, 263 (1984); Catlin v. United States, 324 U.S. 229, 233 (1945).

---

[4]The District Court suppressed a bag of sodium hypophosphite found in Price's jacket immediately following his arrest because there was "no evidence that at the time of Mr. Price's arrest, he was in immediate proximity [of] the jacket." App. 19. This aspect of the District Court's ruling on the motion to suppress is not contested in this appeal. Furthermore, the suppressed evidence was not referenced in the warrant application.

Price preserved his suppression argument, and so we review the District Court's factual determinations for clear error and exercise plenary review over the application of the law to those facts. See United States v. Williams, 417 F.3d 373, 376 (3d Cir. 2005). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Pelullo, 173 F.3d 131, 135 (3d Cir. 1999) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). Accordingly, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety," we will not reverse it even if, as the trier of fact, we would have weighed the evidence differently. Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985).

We review de novo the legal question of whether Price waived his right to appeal the calculation of his Guidelines range. See United States v. Khattak, 273 F.3d 557, 560 (3d Cir. 2001).

III.

Price argues that the Government's actions in obtaining evidence at his Page Road residence violated his Fourth Amendment rights and that the District Court should have granted his motion to suppress that evidence. First, Price contends that the initial[5] consent to search his house was not voluntary and, therefore, the evidence discovered in his bedroom (two glass pipes with suspected methamphetamine residue and a baggie containing sodium hypophosphite) should have been suppressed. Second, Price contends that evidence seized from the basement of his house pursuant to the warrant should be suppressed because the warrant application did not establish probable cause when the allegedly tainted evidence from his bedroom and the prior warrantless search of the basement is excised from the warrant application.

A.

The Fourth Amendment to the Constitution provides: "The

_____

[5]The "initial" consent for purposes of our discussion refers to Fischer's consent to search the living area of the Page Road residence – including the bedroom – as opposed to the basement.

9

right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." "The touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991). Therefore, the Fourth Amendment does not prohibit all searches – only those that are unreasonable. See Illinois v. Rodriguez, 497 U.S. 177, 183 (1990). The general rule is that the warrantless entry into a person's house is unreasonable per se. See Payton v. New York, 445 U.S. 573, 586 (1980). This rule, however, is subject to several "jealously and carefully drawn" exceptions. Jones v. United States, 357 U.S. 493, 499 (1958).

"It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). The Supreme Court has "long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." Jimeno, 500 U.S. at 250-51. To justify a search based on consent, the Government "has the burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968). This burden "is not satisfied by showing a mere submission to a claim of lawful authority." Florida v. Royer, 460 U.S. 491, 497 (1983).

There is "no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." Schneckloth, 412 U.S. at 224. Instead, we determine the voluntariness of a consent by examining the totality of the circumstances. See id. at 227. Both "the characteristics of the accused and the details of the interrogation" are useful to determine whether, under all the circumstances, a consent to search was voluntary, and no case should "turn[] on the presence or absence of a single controlling criterion."[6] Id. at 226.

---

[6] Fourth Amendment tests nearly always involve examination of the totality of the circumstances, because the Amendment "recognizes that no single set of legal rules can capture the ever changing complexity of human life." Georgia v. Randolph, 547 U.S. 103, 125 (2006) (Breyer, J., concurring).

Factors to consider include: the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment. See id.; see also United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994). We have further identified as relevant "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions." United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003).

The District Court found Fischer's initial consent voluntary.[7] The Court noted that Fischer was an adult, apparently of average intelligence, who had previous experience with the criminal justice system. Moreover, "the atmosphere surrounding the encounter was not hostile," since the officers drove her to the Page Road residence after her car ran out of gas, the officers did not have their guns drawn when they asked for Fischer's consent, Fischer was not verbally or physically threatened, and only two officers, Schirra and Wilson, discussed Fischer's initial consent with her in the driveway.

Price attacks the validity of the initial consent on two grounds.[8] First, he alleges that because Fischer was not informed of her right to refuse consent, her consent was involuntary. Specifically, he argues that if the officers had shown Fischer a consent form and asked her to sign it, "she would have been advised of her rights concerning consent and would likely not have signed prior to the search, just as she had refused to sign the form when it was presented to her after the search was over." Price Reply Br. at 1. Second, Price contends that the officers lied to Fischer when they told her that they wanted to search to protect her safety and that of her children; rather, the officers' true intention was to look for evidence of a methamphetamine lab. This alleged deception, according to Price, supports a finding of

---

[7] The District Court's determination of voluntariness is a finding of fact. See Schneckloth, 412 U.S. at 227. As such, we review for clear error.

[8] Price does not argue that Fischer was without authority to give the initial consent.

involuntariness.[9]

We hold that the District Court's determination of voluntariness was not clearly erroneous in light of the totality of the circumstances. First, Schneckloth contradicts Price's contention that the lack of a consent form, without more, means that Fischer consented involuntarily. The Schneckloth Court held that "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the [G]overnment need not establish such knowledge as the sine qua non of an effective consent." Schneckloth, 412 U.S. at 227. The Court explicitly considered – and rejected – the possibility of mandating Miranda-like warnings for all consensual searches. See id. at 231 (concluding that it would "be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning").

Our leading case on the voluntariness of consent supports this conclusion and provides an instructive comparison for our case. In Kim, 27 F.3d 947, a 39-year-old male was traveling from Los Angeles to Chicago on an Amtrak train. Two DEA agents knocked on Kim's sleeper car, looked at Kim's ticket, and then stated that they were with the DEA and that the DEA had problems with people smuggling drugs on similar trains. Without telling him that he could refuse, one agent asked if Kim would consent to have his luggage searched, to which Kim "readily replied 'Sure'." Id. at 950. The agents arrested Kim after they found drugs in his luggage.

We held that the consent was voluntary, observing that Schneckloth held clearly that the Government is not "required to advise the defendant of his right to refuse consent before eliciting his consent." Id. at 955. We found it important that Kim replied to the agents' request "readily" and that Kim was cooperative

_____

[9] Price also notes that after he was arrested, the Government did not ask him for consent to search his home. Instead of obtaining a search warrant for the Page Road residence, the officers went to the house, and when Fischer eventually arrived, they told her that Price had been arrested and that they wanted her consent to search only to make sure that the house was safe for her and her children. But, critically, this is irrelevant to the voluntariness of Fischer's consent, and so will not be considered.

12

during the entire interaction: "Kim's demeanor was no doubt a strong indication of voluntariness. . . . Moreover, the whole encounter was short, lasting only several minutes," and only one officer was visible to Kim. Id. "There was no repeated and prolonged questioning. Nor did [the agent] ask Kim direct, probing, or incriminating questions." Id. We concluded that "particularly in the face of strong evidence of voluntariness," it was not significant that the agents did not advise Kim of his right to refuse consent. Id.

The instant case is analogous to Kim. Even more than in Kim, the circumstances of the encounter were low-key. Fischer was asked for consent as she stood on her own property. Most officers on the scene were deliberately kept away so as not to overwhelm her. The officers who were there did not have their guns drawn. No one threatened, coerced, or promised anything to Fischer. At no point was she arrested, handcuffed, or even touched. Schirra and Wilson both testified that Fischer granted the initial consent to search the house without any reluctance or hesitation whatsoever. There was no prolonged questioning, and the officers did not ask any incriminating questions before seeking consent to search. Moreover, as the District Court set forth, Fischer's age, intelligence, and education were at least average, and she had previous experience with the criminal justice system. In sum, every factor, save one (that she was not advised of her right to refuse consent),[10] favors a finding of voluntary consent. Under these circumstances, Fischer's consent was voluntary, and this is true notwithstanding that Fischer was not advised of her right to refuse consent.

Next, as the District Court found, Price's suggestion that the officers' only concern was to uncover a methamphetamine lab at the Page Road residence is belied by the record. No doubt, the police certainly were looking for a methamphetamine lab. But the agents – indisputably – also wanted to make sure that Fischer and the two children were not placed in danger by the chemicals associated with any such operation. Even after the agents had

---

[10]As the District Court observed, however, "[a]lthough [Fischer] was not advised of her right to refuse consent . . . her subsequent revocation of consent indicates her awareness of that right." App. 5.

13

completed their work at the house, and even after Fischer had refused to sign the consent form, Schirra "advised her that she had to get her kids out, she would have to leave because it was a very potential hazard [sic] for the kids because there was [sic] chemicals in there. They posed an explosive hazard, plus the chemicals smell." App. 120. Schirra also advised Fischer to seek a medical examination for her and for her children. We agree with the District Court that the agents had two motives for seeking consent – to find the methamphetamine lab they thought might be there, and also to safeguard the well-being of Fischer and her children. The officers' statement of reasons for desiring the search does not alter our conclusion that Fischer's consent was voluntary under the totality of the circumstances.

Accordingly, the District Court did not err in refusing to suppress the evidence -- two glass pipes with suspected methamphetamine residue and a baggie containing sodium hypophosphite -- obtained in Price's bedroom following the initial consent.

B.

Price also argues that the evidence obtained pursuant to the search warrant should have been suppressed. He claims that if the warrant application is stripped of evidence obtained in: (1) his bedroom pursuant to the initial consent (we considered and rejected this challenge supra, section III(A)), and (2) the basement pursuant to the warrantless search, then "what remains does not amount to probable cause to support a search." Price Br. at 29.

The parties dispute vigorously three issues related to the warrantless search of the basement: First, did Fischer withdraw the initial consent to search that she had provided to Schirra and Wilson in the driveway, and if so, what was the extent of the revocation? Second, even if Fischer revoked her consent to search the house, and even if that revocation applied to the basement as well, did Fischer later consent voluntarily to a search of the basement? Third, even if Fischer voluntarily consented to the basement search, did she have the authority to consent to such a search?

14

These are all difficult issues, but we need not resolve any of them. Rather, we hold that the search warrant application contained probable cause from independent sources even after excising all the evidence found in the basement. Thus, even assuming Fischer did not consent to the basement search, or did not have authority to consent, the "independent source" rule applies here and vitiates any taint from the initial, assumed illegal, entry.

The independent source doctrine serves as an exception to the exclusionary rule and permits the introduction of "evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." Murray v. United States, 487 U.S. 533, 537 (1988); see United States v. Perez, 280 F.3d 318, 336 (3d Cir. 2002); United States v. Herrold, 962 F.2d 1131, 1140 (3d Cir. 1992).

In Murray, law enforcement agents improperly forced entry into a warehouse and observed burlap-wrapped bales, later found to contain marijuana, in plain view. The agents left the warehouse without disturbing the bales, and did not reenter until they had obtained a search warrant for the warehouse. In applying for the warrant, the agents did not mention the prior entry and did not rely on any observations made during that entry. A magistrate issued a warrant and the agents then conducted a second search of the warehouse and seized the burlap bales containing the marijuana.

The Court observed that the proper remedy for police error or misconduct relating to evidence is to "put[] the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." 487 U.S. at 537 (emphasis in original) (quotation marks omitted). Accordingly, "[w]hen the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." Id. (quotation marks omitted).

The doctrine has both "general" and "specific" aspects. The former "identifies all evidence acquired in a fashion untainted by the illegal evidence-gathering activity. Thus, where an unlawful entry has given investigators knowledge of facts x and y, but fact z has been learned by other means, fact z can be said to be

admissible because derived from an 'independent source.'" Id. at 537-38. In other words, "the evidence found for the first time during the execution of the valid and untainted search warrant was admissible because it was discovered pursuant to an 'independent source.'" Id. at 538. By contrast, in the specific sense, if "officers [] unlawfully enter an area protected by the Fourth Amendment and learn of facts x and y but then later learn of facts x and y independently and lawfully, [they] can have admitted into evidence their knowledge concerning facts x and y." Herrold, 962 F.2d at 1140.

In Herrold, a confidential informant met with the defendant to arrange a cocaine purchase. The informant completed the transaction, and then told the police officers who had been surveying the deal that Herrold was planning to go out to a bar later, that he had been smoking crack and acting "squirrely," and that Herrold had a gun. 962 F.2d at 1134. The officers also knew that Herrold was likely to take more cocaine to the bar and sell it there. Therefore, they decided to arrest Herrold in his trailer without a warrant. While arresting Herrold, they saw a loaded weapon and drug paraphernalia and cocaine in plain view. After securing Herrold, the officers left to get a warrant.

We began our analysis of the applicability of the independent source doctrine in Herrold by recognizing that "we must determine if, without regard to information obtained during the original entry, the police would have applied for the search warrant and we must also determine if there was probable cause for the warrant to be issued." Id. Considering the first question, we reversed the District Court's holding that it was merely "speculative" whether the police would have sought a warrant to search the trailer absent the original entry. Id. at 1141. We held that it was "inconceivable that the police would have left the premises without searching the trailer and without arresting Herrold," based upon all that the officers knew even without the initial entry. Id. at 1140. Considering the second question, we held that "it is obvious that the affidavit for the warrant contains sufficient probable cause apart from information the officers learned via the original entry." Id. at 1141.

Price contends that if, indeed, the police would have applied for a warrant even without the allegedly tainted material, they

should have applied for a warrant before conducting their search. But the question is not what the police should have done. Instead, the issue is whether the police would have applied for a warrant without the material tainted by a warrantless search.

The answer is yes. Indeed, the facts of this case closely track the facts in Herrold. As in Herrold, it seems impossible that the police would not have applied for a warrant to search the basement of the house, knowing that: 1) confidential informants told the police that Price was operating a methamphetamine laboratory in the basement of the Page Road residence; 2) Price had sold Schirra methamphetamine in the past; 3) when arrested, Price had pH papers and baggies containing methamphetamine residue; and 4) Price's bedroom contained glass pipes with methamphetamine residue and a baggie of sodium hypophosphite.

The second question is whether the warrant application contained probable cause without the information gleaned from the basement. The District Court determined that even "assuming that the contraband found in the basement area should not have been included in the affidavit in support of the search warrant, . . . the warrant was independently supportable by other information contained therein." App. 17. "Thus, even if all references to the contraband found in the basement area were excised from the affidavit," the District Court held that "the affidavit would still support a broad search of the premises for the evidence outlined in the warrant." App. 18. We agree with the holding of the District Court.

Probable cause exists if, under "the totality-of-the-circumstances . . . the issuing magistrate [makes the] practical, common-sense decision [that], given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Direct evidence of a crime is not necessary in all cases: "While ideally every affidavit would contain direct evidence linking the place to be searched to the crime, it is well established that direct evidence is not required for the issuance of a search warrant." United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993). Rather, "probable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for

17

concealment and normal inferences about where a criminal might hide stolen property." Id. (quotation marks omitted).

Without any reference to the evidence obtained pursuant to the warrantless basement search, the warrant application would still include at least three key pieces of information about Price's activities: 1) that Price sold Schirra 1/4 gram of methamphetamine on April 5, 2002; 2) that Schirra arrested Price on October 5, 2004, and that when searched, Price possessed "items indicative of methamphetamine trafficking, including plastic baggies with methamphetamine residue and pH papers used to gauge the acidity of the methamphetamine production process"; and 3) that after searching Price's bedroom, Schirra found two glass pipes that were consistent with the ingestion of methamphetamine. See generally App. 217 (Government noting to the District Court the illegality of possessing drug paraphernalia in Pennsylvania, and representing that possession of glass pipes alone would support a search of Price's premises).[11] The warrant application also explains that people who are involved in methamphetamine distribution often have, in their homes, drugs, large quantities of money, and evidence of financial transactions, as well as documentation concerning illegal narcotics, such as "recipes" for making methamphetamine and other substances.

Based on the evidence set forth above, as well as the warrant application's statements regarding the characteristics of those who are involved in methamphetamine production, it is clear that there was probable cause for the warrant to be issued without any reference to the evidence found in the basement of the Page Road residence during the warrantless search. Accordingly, we will affirm the District Court's refusal to suppress the evidence discovered in the basement pursuant to the search warrant.

IV.

Price's second claim is that the Government abused its discretion by refusing to request a third-point reduction of his base offense level for acceptance of responsibility pursuant to U.S.S.G.

---

[11] The warrant application did not mention the baggie of sodium hypophosphite obtained in Price's bedroom.

18

§ 3E1.1(b). We disagree because Price waived his right to appeal this issue. Accordingly, we reject Price's claim.

Price signed a plea agreement on June 16, 2006 that set forth the "full and complete agreement" between the parties. App. 262. Price agreed to plead guilty to Count One of the indictment, and to accept responsibility for Counts Two through Seven. In Paragraph 5, Price also agreed to a comprehensive waiver of appeal, subject to only three exceptions. See App. 263. The three exceptions were: 1) if the Government appealed; 2) if the sentence exceeded the statutory limits or "unreasonably" exceeded the guideline range; and 3) the conditional appeal dealt with in section III, supra, that is "whether his motion to suppress the evidence seized from his residence was properly denied." Id. These were the only three exceptions, and the agreement explicitly stated that "[t]he foregoing reservations of the right to appeal on the basis of specified issues do not include the right to raise issues other than those specified." App. 264 (emphasis added).

The Government, in exchange for this guilty plea, agreed to recommend that "the Court reduce the offense level by 2 levels for acceptance of responsibility" pursuant to § 3E1.1. Id. Nowhere was mentioned a third-point reduction pursuant to § 3E1.1(b). Finally, the plea agreement reiterated that "[t]his letter sets forth the full and complete terms and conditions of the agreement between JOHN JOSEPH PRICE, JR. and the [Government], and there are no other agreements, promises, terms or conditions, express or implied." App. 266.

We have held that "[w]aivers of appeals, if entered into knowingly and voluntarily, are valid, unless they work a miscarriage of justice." Khattak, 273 F.3d at 563. Here, the written waiver is undoubtedly comprehensive as applied to a challenge brought under § 3E1.1(b) of the Guidelines, because it precludes any appeal from Price's "conviction or sentence under 28 U.S.C. § 1291 or 18 U.S.C. § 3742." App. 263. Indeed, the language here tracks closely that of the waiver of appeal enforced in United States v. Gwinnett, 483 F.3d 200, 204 (3d Cir. 2007) (upholding written waiver in plea agreement as "comprehensive" which stated that the Government and defendant "waive certain rights to file an appeal, collateral attack, and writ or motion after

sentencing, including but not limited to an appeal under 18 U.S.C. § 3742").

Therefore, "[w]e next look to the colloquy between the sentencing judge and [Price] during the [sentencing] hearing," Gwinnett, 483 F.3d at 204, because to "determin[e] whether a waiver of appeal is 'knowing and voluntary,' the role of the sentencing judge is critical," Khattak, 273 F.3d at 563. First, at the sentencing hearing, the Government presented the terms of the plea agreement in open court, noting that under the agreement Price "also agrees to waive his right to file any appeals subject to the limitations in the plea agreement," and noting specifically that the "one issue" Price was capable of appealing was the suppression issue. App. 251-52. The Government also stated that "[i]n exchange, . . . the [G]overnment agrees to recommend a two-point reduction in [offense] level for his timely acceptance of responsibility." App. 252. Price's attorney then noted that "the appeal waiver also allows Mr. Price's ability to appeal if the Government appeals the sentence if the sentence is at maximum, and also allows him to appeal unreasonable guidelines to be determined by the Court." Id.

The District Court asked Price whether he had read and reviewed the agreement and whether he agreed to its terms and conditions. Price answered "yes" to each question. The Court then had Price sign the agreement in open court, and Price certified that he understood that by virtue of signing the agreement, he was "attesting by [his] signature that [he] agreed with all the terms and conditions." App. 254.[12]

We hold that the appellate waiver in this case was entered into knowingly and voluntarily and that enforcement of the waiver

---

[12] We note that the procedure employed by the court in this case is nearly identical to the procedure employed by the district court in Gwinnett. See 483 F.3d at 204 ("[T]he District Court asked Gwinnett whether she read the plea agreement, discussed it with her attorney, asked her attorney questions about the agreement, and came to understand the agreement before signing it. Gwinnett answered in the affirmative to each question. . . . In addition, the District Court confirmed that Gwinnett had signed the plea agreement.").

will not result in a miscarriage of justice. Accordingly, we will enforce the waiver of appeal, and Price cannot succeed on his § 3E1.1(b) claim.

V.

For the reasons set forth above, we will affirm the District Court's suppression decision and its sentencing calculation.