NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-3393
_____

UNITED STATES OF AMERICA

v.

SHAMEK HYNSON
a/k/a Shy, a/k/a Legend

Shamek Hynson,
Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal No. 2-05-cr-00576-002
(Honorable Juan R. Sanchez)
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
November 7, 2011

Before:  SCIRICA, SMITH and JORDAN, *Circuit Judges*.

(Filed: November 14, 2011)
_____

OPINION OF THE COURT
_____

SCIRICA, *Circuit Judge*.

Defendant Shamek Hynson was found guilty of conspiracy to distribute 50 grams

or more of cocaine base ("crack") and heroin in violation of 21 U.S.C. § 846; using and

carrying a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2; and possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1).

On appeal, Hynson raises two challenges. First, he contests the District Court's denial of his motion to suppress physical evidence recovered from his residence in Utica, New York. Second, he challenges the Court's admission of "other bad acts" evidence under Federal Rules of Evidence 404(b) and 403. We will affirm.[1]

## I.

In 2004 and 2005, Shamek Hynson was involved in a drug distribution organization based in Lancaster, Pennsylvania. Hynson's participation consisted of selling crack cocaine and heroin, distributing drugs for sale, acquiring firearms, and engaging in violence to extract payments for drugs.

On October 18, 2004, Hynson shot Edward Cameron in connection with a drug debt. The gun used in the shooting was later identified as one purchased in North Carolina by Tolanda Williams, a former girlfriend of Hynson. Williams and another former girlfriend, Shanika Wilson, both participated in a straw purchasing scheme for Hynson which involved acquiring firearms in other states and transporting them to Lancaster for Hynson's use in the cocaine conspiracy ring. On some occasions, Hynson resold the firearms in New York.

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291.

2

Immediately after the Cameron shooting, Hynson fled to Utica, New York. He called Wilson and requested that she visit a storage facility to pick up a bag containing drugs and firearms, which she then transported to Hynson.

On December 8, 2004, local police officers arrested Hynson in Utica, New York. The officers found keys to 705 Lansing Street in his possession. United States Marshals then proceeded to 705 Lansing Street, knocked on the door, and were greeted by Wilson. She identified herself as Tamika Brown. Wilson permitted the marshals to enter and after a brief discussion with the officers about Hynson, she admitted her real identity. The marshals informed Wilson that there was an outstanding warrant for her arrest in South Carolina and read her *Miranda* rights, which she acknowledged and waived. They then requested consent to search the residence and provided Wilson with a standard consent form. The form notified the signator of her constitutional right to refuse consent. Wilson signed the form.

After obtaining consent, the marshals searched the residence and found a sweatshirt and camouflage hat containing bags of a chunky white substance, which they believed to be cocaine. They immediately obtained a search warrant. Pursuant to the search warrant, the marshals seized physical evidence from 705 Lansing Street that included drugs, drug distribution paraphernalia, firearms, ammunition, receipts, and cash. Wilson was then placed under arrest.

**II.**

Hynson contends the District Court erred in denying his motion to suppress the physical evidence gathered from his residence in Utica, New York, on the basis that

3

Wilson's consent to the search was not voluntary. We review "for clear error as to the underlying factual findings and exercise[] plenary review of the District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

In most instances, a search of a home conducted without a valid warrant will violate the Fourth Amendment. *Kyllo v. United States*, 533 U.S. 27, 31 (2001). But a clearly recognized exception exists where an occupant with the requisite authority voluntarily consents to the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Katz v. United States*, 389 U.S. 347, 358 n.22 (1967). Assessing whether consent was in fact voluntary necessitates examining the totality of the circumstances. *Schneckloth*, 412 U.S. at 226. Factors important to this analysis include the age, education, and intelligence of the consenter; whether she was advised of her constitutional rights; the length of the encounter; the duration of questioning; and the use of physical punishment. *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009). Also relevant is the setting in which the consent was obtained and the parties' actions. *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003). Fundamental to the concept of voluntariness is that valid consent must not be coerced. *Schneckloth*, 412 U.S. at 228.

The District Court correctly found Wilson's consent to the search was voluntary.[23] Wilson was a twenty-one year old adult at the time of the search, and there is no evidence that her educational or intellectual background hindered her ability to give valid consent. Although Wilson initially gave officers a false name, she permitted them to enter the residence and question her about Hynson. At no time did the marshals draw their weapons or act in a physically threatening manner. After Wilson admitted her true identity, the officers read Wilson her *Miranda* rights and handed her a standard consent to search form—this form contained an express provision notifying Wilson that she had the right to refuse consent. Wilson then signed the form.

While the Supreme Court has recognized actual knowledge of the right to refuse consent is not a prerequisite to voluntariness, *id.* at 234, we agree with the government that such knowledge "is compelling evidence that any consent obtained thereafter is voluntary." Brief for Appellee at 33.

---

[2] An inquiry into Hynson's standing to assert a violation of the Fourth Amendment is unnecessary. The government did not contest Hynson's standing in the District Court, and does not contest it now. Standing in a Fourth Amendment claim may be conceded to the district court, *United States v. Stearn*, 597 F.3d 540, 551 n.11 (3d Cir. 2010), with the effect of precluding the government from challenging standing on appeal. *Steagald v. United States*, 451 U.S. 204, 209 (1981). Since the government did not challenge standing in the District Court, we will assume that Hynson satisfies the requirements of standing.

[3] Consent is only recognized when it is given by a person with common authority over the area shared by the defendant. *Georgia v. Randolph*, 547 U.S. 103, 106 (2006); *United States v. Matlock*, 415 U.S., 164 (1974); *United States v. Morales*, 861 F.2d 396, 399 (3d Cir. 1988). Hynson does not contest Wilson's authority to consent to the search. Before the search, Wilson told officers that she and Hynson shared the bedroom in which the drugs were found, which was enough to show "common authority" over the area.

Hynson's main contention is that the officers coerced Wilson's consent by threatening her with arrest if she refused to allow the search. Brief for Appellant at 14, 15. In fact, there was an outstanding warrant for Wilson's arrest at the time of the search, and once the marshals learned of Wilson's true identity, she was read her *Miranda* rights. Even if Hynson's characterization of this encounter were plausible,[4] this factor is not dispositive. We must consider the totality of the circumstances, and the undisputed facts show Wilson invited the marshals into the residence, willingly conversed with them, was given notice of her *Miranda* rights, and signed the consent form which expressly notified her of the right to refuse consent. When taken together, these facts demonstrate Wilson's consent was voluntary.

Because Wilson's consent was voluntary, the officers properly searched the apartment, discovered drugs, and therefore had probable cause to obtain a search warrant. The physical evidence gathered from Hynson's residence was lawfully obtained. Accordingly, the District Court did not err in denying Hynson's motion to suppress.

## III.

### A.

Hynson also contends the District Court erred in admitting evidence of "other bad acts" he committed, violating Fed. R. Evid. 404(b) and 403. We review for an abuse of discretion. *United States v. Butch*, 256 F.3d 171, 175 (3d Cir. 2001).

---

[4] Wilson's testimony at trial does not support Hynson's characterization of a coerced confession. In fact, Wilson agreed on direct examination that she was not forced, threatened, or coerced to sign the consent form.

6

Rule 404(b) excludes extrinsic crimes and acts offered only to show propensity. Fed. R. Evid. 404(b). Such evidence is admissible if offered to prove any relevant issue enumerated in Rule 404(b). Rule 404(b) does not apply at all to evidence that is intrinsic to the charged crime. *United States v. Green*, 617 F.3d 233 (3d Cir. 2010); *United States v. Cross*, 303 F.3d 308 (3d Cir. 1999). Evidence is intrinsic if it "directly proves" the charged crime, or if it is concerned with contemporaneous acts which facilitated the commission of a charged offense. *Green*, 617 F.3d at 248-49.

Hynson first contends testimony about a straw purchasing scheme for obtaining firearms was inadmissible under Rule 404(b). But Hynson was charged with, *inter alia*, using an illegal firearm in a drug trafficking offense and illegal possession of firearms. The evidence pertaining to Hynson's straw purchasing scheme was not propensity evidence—it was intrinsic evidence of the crimes charged. In fact, one of the guns purchased by Hynson's former girlfriend was the basis for the illegal possession charge against Hynson. Further, the gun used in the shooting of Cameron was purchased through Hynson's straw purchasing scheme.

In addition, the evidence of Hynson's straw purchasing scheme also shed light on his involvement in the cocaine distribution conspiracy. In *United States v. Gibbs*, 190 F.3d 188, 217-18 (3d Cir. 1999), the trial court properly admitted evidence of the defendant's use of violence as direct evidence of his participation in a drug conspiracy.[5]

---

[5] While *Gibbs* was decided prior to the Third Circuit's clarification of the "intrinsic evidence test" in *Green*, the conclusion that uncharged acts of violence are admissible to prove a charge of drug conspiracy is still valid. The Third Circuit expressly endorsed *Gibbs* as a proper application of evidence that "directly proves" a charged offense,

Similarly, the District Court here admitted evidence of the straw purchasing scheme to show how Hynson acquired and used guns to collect drug debts, intimidate rival gangs, and facilitate shootings. The evidence of straw purchases of firearms operated as direct proof of conspiracy.[6]

Second, Hynson contends the admission of evidence of his drug possession at his Utica, New York residence was improper under Rule 404(b). Hynson left Lancaster following the shooting of Cameron on October 18, 2004. Wilson testified that Hynson asked her to retrieve drugs and firearms from a storage facility and bring them to Utica, New York. These items were later seized pursuant to a search of Hynson's Utica, New York residence. Because the drugs and firearms were transported from Hynson's Lancaster headquarters, and were part of his Lancaster cocaine distribution operation, this evidence also was direct proof of the charged conspiracy.

**B.**

If evidence survives a Rule 404(b) challenge, it is also subject to a Rule 403 balancing test to determine whether its probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403; *Green*, 617 F.3d at 249 n.15. Hynson

_____

*Green*, 617 F.3d at 248-49, and further recognized that "most, if not all, other crimes evidence currently admitted outside the framework of Rule 404(b) as 'background' evidence will remain admissible under the approach we adopt [in *Green*]." *Id.* at 249.

[6] To the extent there is any doubt as to whether the challenged evidence is intrinsic, that doubt is not troubling because, even if evidence concerning some of the straw purchases were extrinsic, admission of that evidence was harmless. Given the properly admitted evidence of Hynson's straw purchases and possession of multiple firearms in connection with the drug conspiracy, any evidence that Hynson engineered straw purchases and the reselling of guns arguably unrelated to the conspiracy cannot be considered as having contributed to the verdict. *See United States v. Hinton*, 423 F.3d 355, 362-63 (3d Cir. 2005).

contends even if the drug and firearm evidence was admissible, the District Court should have found that the unfair prejudice of such evidence substantially outweighed its probative value.

Contrary to Hynson's contention, the District Court conducted a Rule 403 balancing test and addressed the probative value of the evidence seized from his Utica, New York residence. The Court concluded "the gun and drug evidence['s] . . . probative value outweighed any prejudicial effect." This decision was not in error. Hynson's possession of drugs, drug paraphernalia, and firearms was probative of his participation in a conspiracy to distribute cocaine. Even if some of the guns acquired through the straw purchasing scheme were resold in New York rather than used in the Lancaster distribution ring, any prejudice in admitting this evidence did not outweigh its probative value.

## IV.

For the foregoing reasons, we will affirm the judgment of the District Court.