**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1741
_____

UNITED STATES OF AMERICA

v.

JAMES M. HARRIS, III,
a/k/a James Smalls,
a/k/a James Gunplay,

James M. Harris, III,
                                    Appellant
_____


On Appeal from the United States District Court
for the District of New Jersey
(No. 1-11-cr-00783-004)
District Judge:  Honorable Renée M. Bumb

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
November 22, 2013


_____

Before:  AMBRO, SMITH, and CHAGARES, Circuit Judges

(Filed: December 4, 2013)


_____

OPINION
_____


CHAGARES, Circuit Judge.

James M. Harris, III appeals his convictions for conspiracy to commit robbery affecting interstate commerce and conspiracy to distribute and possess with intent to distribute cocaine on the grounds that the District Court erred by not suppressing evidence. Harris also appeals his sentence, arguing that the District Court should have granted his request for minor and minimal role adjustments and his motion for a downward departure based on sentencing entrapment and sentencing factor manipulation. For the reasons that follow, we will affirm the judgment of conviction and sentence.

I.

We write solely for the parties and will therefore recount only those facts that are essential to our disposition. In January 2012, a grand jury returned a superseding indictment charging Harris (also known as "Gunplay" and "Smalls") and three others[1] with conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) and conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. The charges arose from Harris's involvement in a plan to rob a cocaine stash house, which — unbeknownst to Harris and his co-conspirators — was devised by special agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

In early July 2011, a confidential source reported to the ATF that Shawn Cannon was responsible for a series of violent robberies of drug dealers and users in southern New Jersey. The confidential source arranged for Cannon to meet with undercover ATF

---

[1] Harris's co-defendants were Shawn L. Cannon, Zealeeta Francis, and Henry D. Morgan. Harris was the only defendant to proceed to trial. Co-conspirator Lamont Howard was separately charged.

Agent Stacy Brown. At the meeting, which was held on July 18, 2011 in a parking lot in Pennsauken, New Jersey, Brown pretended to be a disgruntled cocaine courier for a Mexican drug trafficking organization who was looking for help with robbing his source of supply.[2] Brown explained that his job entailed picking up kilogram quantities of cocaine[3] from different stash houses near Cherry Hill, New Jersey, which were usually occupied by two armed guards. Brown emphasized that the guards were dangerous, and he needed an experienced crew. Cannon responded, "[y]ou got the right people." Appendix ("App.") 902. Francis also assured Brown that she and Morgan were "trained to go." App. 905.

Follow-up meetings were held on July 20, 2011. At the first meeting, Cannon announced that six people would be involved in the robbery. Brown expressed his desire to meet the remaining participants, and Cannon indicated that another meeting could be arranged with his "back up soldiers," including "Gunplay" (Harris) and "Rambo" (Morgan). App. 469-70, 948. During the second meeting, which occurred later that day, Harris asked Brown several pointed questions about the robbery, such as what kind of guns the guards carried and whether there would be lookouts around the stash house. When Brown remarked that the cocaine had to be removed from its original wrapper before being resold, Harris acknowledged, "[t]here's a stamp." App. 957. Before the

---

[2] Henry Morgan drove Cannon and Zealeeta Francis to the parking lot, but remained in the car for the duration of the encounter.
[3] Brown "guarantee[d]" Cannon (and Francis, who also attended the meeting) that there would be at least fifteen "bricks" (kilograms) of cocaine in the stash house. Appendix ("App.") 449-50, 718-19, 901-02.

3

meeting ended, Harris stated that he was "ready" and described the intended robbery as "another day at the job." App. 975.

Between July 20 and 27, 2011, Brown maintained phone communication with Cannon and Francis, who in turn communicated with Harris. Harris met again with his co-conspirators on July 27 and during the morning on July 28. At approximately 12:30 p.m. on July 28, Brown called Francis and informed her that he was ready to execute the plan. Brown instructed Francis to get the rest of the crew together and to meet him at the Cherry Hill Mall. Although Francis complied with Brown's request,[4] ATF surveillance of a conversation between Brown, Cannon, and Francis upon Cannon and Francis's arrival showed that Cannon and Francis were becoming suspicious of Brown and believed him to be a law enforcement officer. The robbery was not carried out, and the co-conspirators parted ways several days later.

At 6:00 a.m. on December 21, 2011, approximately nine ATF agents arrived at Harris's home with a warrant for his arrest. Harris was handcuffed and put into the back seat of a police patrol vehicle parked outside. Three or four agents then spoke with his parents, James Harris, Jr. ("Mr. Harris") and Esther Harris ("Mrs. Harris"), in the living room. ATF Special Agent Greg Sheridan asked Harris's parents to consent to a search of the house. Mrs. Harris refused and urged Mr. Harris to do the same. Mr. Harris agreed to consent but expressed concern about possible damage to the property. Sheridan advised Mr. Harris that he could limit the scope of the search to Harris's room. Mr.

---

[4] Harris drove Cannon, Francis, and an unindicted individual to the mall parking lot in his car. Morgan and two others arrived in a separate vehicle.

Harris then reviewed and signed a consent-to-search form on which he wrote "garage only" (where Harris was living at the time).  App. 34.[5]

After obtaining Mr. Harris's written consent to search, Sheridan separately approached Harris, who was still handcuffed in the police vehicle, to obtain permission to search his bedroom and car.  Because he believed Harris was too dangerous to be released, Sheridan did not remove the handcuffs to permit Harris to complete a written consent form.  Harris orally consented to the requested searches.  While searching Harris's room, the agents found one red sweatshirt with the word "Gunplay" and one black ballistic vest.

Harris moved before trial to suppress both items.  An evidentiary hearing was held, and, on October 10, 2012, the District Court orally denied the motion on the grounds that the warrantless search was conducted pursuant to Mr. Harris's valid consent. Following a six-day jury trial, Harris was convicted of both conspiracy counts.

The United States Probation Office prepared a presentence investigation report ("PSR").  The PSR calculated that Count One (conspiracy to commit Hobbs Act robbery) carried an offense level of 21, U.S.S.G. § 2B3.1(a), (b)(6), and that Count Two (drug conspiracy) carried an offense level of 36, id. § 2D1.1(b)(1), (c)(3).  PSR ¶¶ 60-61. Because the offense level for Count One was nine or more levels less serious than that for Count Two, Probation disregarded Count One and adopted a total offense level of 36.

---

[5] Sheridan testified that Mr. Harris was calm and coherent and did not appear to be frightened, distressed, or under the influence of drugs or alcohol.  Mr. Harris testified that he initially refused to sign the form, but "gave up" when the agents threatened to "tear [the] walls apart" in the event he refused.  App. 171-72, 191.  At the time he was presented with the form, Mr. Harris was not handcuffed.

PSR ¶ 62.[6]  Observing that Harris "appears to have been the least involved in the conspiracy," Probation awarded him a two-level minor role adjustment on both counts. PSR ¶¶ 65, 75-78, 81-84; see U.S.S.G. § 3B1.2(b).  Harris's final offense level of 34, combined with a criminal history category of I, yielded an advisory Guidelines range of 151 to 188 months of imprisonment.  PSR ¶¶ 97, 105, 134.  Both parties objected to the PSR calculations.  The Government challenged the minor role reductions, and Harris argued that his minimal role in the drug conspiracy warranted a four-level adjustment on that count.  Harris also moved for a two-level downward departure for sentencing entrapment "and/or" sentencing factor manipulation.  Supplemental Appendix ("Supp. App.") 141.

Harris's sentencing hearing was held on March 7, 2013.  At the hearing, the District Court agreed with the Government that Harris was neither a minor nor a minimal participant in the charged conspiracies.  The court therefore held that Harris's final offense level was 36, which, combined with his criminal history category of I, resulted in an advisory Guidelines range of 188 to 235 months of imprisonment.  The court next addressed Harris's departure motion.  While it assumed it had the authority to depart downwardly on the grounds of sentencing entrapment and sentencing factor manipulation, the court declined to do so.  After considering the factors set forth in 18 U.S.C. § 3553, the court imposed a within-Guidelines sentence of 211 months of

---

[6] See U.S.S.G. § 3D1.4(c) ("Disregard any Group that is 9 or more levels less serious than the Group with the highest offense level.  Such Groups will not increase the applicable offense level but may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level.").

imprisonment on each count, to be served concurrently, plus a five-year term of supervised release and a $200 special assessment. Harris timely appealed.

II.[7]

Harris first argues that the District Court should have granted his pretrial motion to suppress the items seized in his bedroom on the day of his arrest. In reviewing the denial of a motion to suppress, we examine the District Court's factual findings for clear error and review its legal determinations under a plenary standard. United States v. Brownlee, 454 F.3d 131, 137 (3d Cir. 2006).

"It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). To justify a search based on consent, the Government bears the burden of proving that the consent was "freely and voluntarily" given. Bumper v. North Carolina, 391 U.S. 543, 548 (1968). In determining voluntariness, courts consider "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." United States v. Price, 558 F.3d 270, 278 (3d Cir. 2009).

Harris primarily attacks the constitutionality of the search on the grounds that Mr. Harris's consent to the search was "[o]verr[iden]" by Mrs. Harris's refusal to consent.

---

[7] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

7

Harris Br. 14.[8] Harris relies on <u>Georgia v. Randolph</u>, 547 U.S. 103 (2006), where the Supreme Court held that "a physically present co-occupant's stated refusal to permit entry . . . render[s] the warrantless search unreasonable and invalid as to him." <u>Id.</u> at 106. Harris concedes that <u>Randolph</u> did not resolve — and neither the Supreme Court nor this Court has since considered — the effect of objections to a search by persons other than the defendant. <u>See</u> <u>id.</u> at 120 n.8; Harris Br. 19. He argues, however, that Mrs. Harris's refusal to consent must be considered "as a factor" in evaluating the validity of Mr. Harris's consent. Harris Br. 19.

The District Court found that Mrs. Harris's refusal to consent was relevant to, but not "dispositive" of, the validity of Mr. Harris's consent. App. 325. There is ample evidence to support the court's conclusion that Mr. Harris's consent was voluntary, such as Mr. Harris's age (fifty-three), level of education completed (high-school), experience with the criminal justice system (two prior felony convictions and additional arrests), and — perhaps most importantly— signature on a consent form that he read and evidently understood. As a result, we hold that the District Court did not err in denying Harris's motion to suppress.[9]

III.

A.

---

[8] The Government argues, incorrectly, that Harris failed to raise and has thus waived this argument. Harris's argument on appeal (that Mrs. Harris's refusal of consent affects the validity of Mr. Harris's consent) was copied, verbatim, from Harris's memorandum in support of his motion to suppress. <u>Compare</u> Harris Br. 19, <u>with</u> Supp. App. 40-41. Accordingly, it has not been waived.

[9] The District Court did not, and this Court need not, reach Harris's argument that his oral consent was involuntary.

Harris's second argument is that he was entitled to downward adjustments for his allegedly minor and minimal roles in the robbery and drug conspiracies, respectively. "We employ a mixed standard of review when considering whether a defendant was entitled to a base level reduction for being a minimal or minor participant in the criminal activity." United States v. Carr, 25 F.3d 1194, 1208 (3d Cir. 1994). When a district court's denial of a downward adjustment is based primarily on a legal interpretation of the Guidelines, we exercise plenary review. Id. Where, as here, the denial is based primarily on factual determinations, we review only for clear error. Id.

Under the advisory Sentencing Guidelines, a defendant's offense level may be reduced by two levels if the defendant was a "minor participant," U.S.S.G. § 3B1.2(b), and by four levels if the defendant was a "minimal participant," in any criminal activity, id. § 3B1.2(a). A "minor participant" is one who "is less culpable than most other participants, but whose role could not be described as minimal." Id. cmt. n.5. A "minimal participant" is one who "plays a minimal role in concerted activity." Id. cmt. n.4. The minimal participant reduction is "intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group." Id. In determining whether a defendant's role was minimal or minor, courts consider "the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." United States v. Rodriguez, 342 F.3d 296, 299 (3d Cir. 2003) (quotation marks omitted).

9

As an initial matter, we summarily reject Harris's argument that he was erroneously denied a two-level adjustment for his minor role in the robbery conspiracy charged in Count One. Even assuming the District Court made a mistake, the error was harmless — even with the adjustment, his total offense level would have remained the same pursuant to the PSR's application of U.S.S.G. § 3D1.4(c). See PSR ¶ 62.[10]

Moreover, the District Court's decision not to apply either adjustment was not erroneous. The evidence available to the District Court at sentencing showed that Harris participated in all but two of the six meetings in preparation for the robbery, including one with the undercover ATF agent. While Harris was not as vocal as his co-conspirators during the meeting with Brown, he asked several pointed questions about the intended target, including whether it was protected by lookouts and if the guards inside would be armed. Morgan testified at trial that, on the day of the robbery, Harris was carrying a black ski mask and black baseball gloves. The court found that these details contradicted Harris's averment that his intended role in the robbery was limited to serving as a getaway driver. The court concluded that Harris's role was no different than Morgan's or Howard's[11] and denied his request for a minor role adjustment on Count One. The court similarly held, in rejecting Harris's request for a minimal role adjustment on Count Two, that the above evidence showed Harris "clearly" understood the "scope and the structure of the conspiracy and the enterprise." App. 878.

---

[10] Harris did not challenge, and the District Court incorporated, the PSR's grouping analysis.

[11] The Government conceded that Cannon and Francis were more culpable than the other defendants due to their leadership role in the conspiracy.

"[W]hen the district court's decision is based on testimony that is coherent and plausible, not internally inconsistent and not contradicted by external evidence, there can almost never be a finding of clear error." United States v. Igbonwa, 120 F.3d 437, 441 (3d Cir. 1997). The District Court's denial of Harris's requests for minor and minimal role adjustments easily satisfies this standard. We will therefore affirm its calculation of Harris's total offense level.

B.

Harris's final argument is that the District Court erred in rejecting his motion for a downward departure based on sentencing entrapment and sentencing factor manipulation. The District Court assumed,[12] but declined to exercise, its authority to depart downwardly on these grounds. App. 880-81. Accordingly, we lack jurisdiction to review the District Court's ruling. United States v. Isaac, 655 F.3d 148, 158 (3d Cir. 2011) ("[I]n contrast to determining whether a sentence is reasonable, appellate courts lack jurisdiction over the merits of a district court's discretionary decision not to depart downward from the Guidelines once it is determined that the district court properly understood its authority to grant a departure.").

IV.

For the foregoing reasons, we will affirm Harris's judgment of conviction and sentence.

---

[12] This Court has neither adopted nor rejected the doctrines of sentencing entrapment and sentencing factor manipulation. United States v. Sed, 601 F.3d 224, 229 (3d Cir. 2010).