

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-30-2005

# USA v. Mornan

Precedential or Non-Precedential: Precedential

Docket No. 04-1319

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Mornan" (2005). 2005 Decisions. Paper 904.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/904

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

NO. 04-1319
_____

UNITED STATES OF AMERICA

v.

CHRISTOPHER MORNAN,


Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 02-cr-00242)
District Judge: The Honorable Sylvia H. Rambo

_____

Argued June 9, 2005

BEFORE: AMBRO, VAN ANTWERPEN and TASHIMA[*],
<u>Circuit Judges,</u>

_____

[*]The Honorable A. Wallace Tashima, Senior United States Circuit
Judge for the Ninth Circuit, sitting by designation.

(Filed:  June 30, 2005)

Dennis E. Boyle (Argued)
1525 Cedar Cliff Drive
Camp Hill, PA 17011
*Counsel for Appellant*

Thomas A. Marino
        United States Attorney
Theodore B. Smith, III (Argued)
        Assistant U.S. Attorney
Federal Building
228 Walnut Street
Harrisburg, PA 17108
*Counsel for Appellee*

---

OPINION

---

VAN ANTWERPEN, <u>Circuit Judge</u>

Appellant Christopher Mornan was charged in an 18-count indictment with mail fraud, wire fraud, and conspiracy arising from an alleged telemarketing scheme.  A jury found Mornan guilty of 15 of the 18 counts, and he was sentenced in accordance with the United States Sentencing Guidelines.  Mornan now challenges various evidentiary rulings made by the District Court during his trial.  He also appeals his sentence in light of the Supreme Court's decision in <u>United States v. Booker</u>, 543 U.S. __, 125 S. Ct. 738 (2005).  For the

reasons set forth below, we will affirm the District Court's evidentiary rulings and the conviction, vacate the sentence, and remand for re-sentencing.

## I. FACTUAL AND PROCEDURAL HISTORY

A.    <u>Background</u>

Mornan's wire and mail fraud indictment alleged that he was involved in a "cross-border advance fee scheme," whereby he and his co-conspirators, operating out of Canada, placed newspaper advertisements in the United States offering loans to high-risk borrowers. The advertisements provided a toll-free number to call for details. When a customer called the number, he or she reached one of many telephone sales rooms located in Canada. A telephone sales representative would instruct the customer to complete and return a loan application. Once the application was completed, another individual – a "closer" – would call the customer and represent that the loan had been approved. The customer was then told that he or she would have to purchase a life or disability insurance policy to secure the loan. In many instances, the "closer" would tell the customer that the insurance premiums would be returned upon full repayment of the loan amount.

The customers who sent money orders for the "insurance premiums" never actually received any loans, and their payments were never returned. Mornan was an assistant manager at one of the telephone sales rooms, and he also worked as a "closer," often using the alias "Richard Harding."

3

The Government further alleged that Mornan eventually became a "higher level manager" and had a leadership role in the scheme.

The telephone representatives would tell customers that they worked on behalf of a number of loan brokerage companies, one of which was Sun Corp. Financial Services ("Sun Corp."). On June 23, 1998, Canadian law enforcement authorities conducted a search of the Sun Corp. offices in Ontario. The police found Mornan and his alleged co-conspirator, Leslie Card, in one of the offices. The police confiscated a list of loan applicants, a list of United States newspapers, and some Sun Corp. loan applications from the desk Mornan was using.[1]

The Canadian authorities also interviewed Mornan, who stated that he was an "[a]ssistant manager/closer" and that he and Card shared the role of office manager. (App. at 1110.) He also stated that his job was to answer phones, take customers' information, and tell them that their loan application had been accepted. (Id. at 1112.) When asked whether he believed that his company was actually providing loans to customers, Mornan responded, "No. To my knowledge it's a referral agency." (Id. at 1111.) When asked who actually contacts lenders to arrange loans, Mornan responded, "I don't know, there is no lender." (Id. at 1110.)

_____

[1] An office diagram indicated that the desk belonged to Richard Harding, and Mornan admitted to the police that he was working under that name.

B.    Trial and Sentencing

At Mornan's trial, conducted from April 8 to April 11, 2003, the Government presented the testimony of multiple law enforcement officials who were involved in a "strategic partnership" between the United States and Canada set up to investigate "cross-border frauds."  The Government also presented the testimony of 12 individuals who claimed to be victims of the telemarketing scheme.  In addition, the jury was shown videotape depositions of Jeffrey Peters, the lessor of a Toronto property that Mornan rented for use as a telephone sales room, and Michelle Fulfit, one of the telephone salespersons who fielded calls in Ontario.

Also relevant to this appeal was the testimony of Althea Burton, the cousin of Michael Willams, who owned and operated Icon Cheque Cashing Services, Inc. ("Icon") in Ontario.  Burton worked for her cousin at Icon from May 2000 to January 2001, and the Government attempted to establish through her testimony that Mornan used Icon to cash money orders that had been made out to various "insurance companies."  The Government was permitted to show the jury Burton's testimony in the form of a videotape deposition that she gave in Canada.  During that testimony, Burton indicated that she could no longer remember the particulars of her employment at Icon.

Faced with her purported memory lapse, the Government directed Burton's attention to a statement she made to the prosecutor and United States Postal Inspector Michael Hartman on September 12, 2001, wherein she

identified Mornan as the individual who routinely cashed money orders at Icon that were made out to several "insurance companies." However, Burton stated that she did not remember the particulars of the September 2001 statement either. She attributed her memory loss to back and neck injuries suffered during an August 19, 2002, automobile accident.

The Government then attempted to offer the substance of the September 2001 statement into evidence as a past recollection recorded under Fed. R. Evid. 803(5). The District Court initially ruled that the statement did not qualify under Rule 803(5). The Government alternatively argued that the statement was admissible as a prior inconsistent statement under Fed. R. Evid. 801(d)(1)(A), but the court also rejected that argument. However, after reviewing Burton's videotape testimony, the District Court changed its ruling and admitted the statement, over the defense's objection, as a prior inconsistent statement under Rule 801(d)(1)(A). The court reasoned that "it can't be concluded that the memory loss is solely due to the accident as opposed to her own volition. . . ." (App. at 383.)

The final piece of evidence that is relevant to this appeal is the testimony of Kirsten Jackson, a forensic document examiner with the United States Postal Inspection Service National Forensic Laboratory. The Government called Jackson as a handwriting expert to give her opinion regarding whether a signature on a lease, some handwritten notes, and signatures on money orders were authored by Mornan. Jackson testified as to her qualifications as a

6

document examiner, and the District Court permitted her to testify "as an expert in the area of forensic document examination." (Id. at 399.) Defense counsel did not object at trial to her testimony and expressly waived the opportunity to conduct a voir dire of Jackson's qualifications. (Id.)

Jackson explained that she formed her opinions by comparing the questioned documents with an example of Mornan's handwriting. She testified that her ability to form an expert opinion regarding the author of a specific writing falls along a "continuum," depending on degrees of similarities and differences between the questioned document and the handwriting sample. She then went through a very detailed presentation explaining the factors that contributed to her conclusions in this case. Of 21 exhibits (or pages of exhibits) examined, Jackson concluded that Mornan definitely wrote four of them and "probably" wrote two others. However, she could not reach a definitive conclusion as to 15 of the exhibits, testifying that she was only able to note similarities between these documents and Mornan's handwriting, but not enough to conclude that he was definitely, or even probably, the author. When asked on cross-examination whether her opinions were rendered "within a reasonable degree of scientific certainty," she responded, "I think they are." (Id. at 455.) Again, although defense counsel cross-examined Jackson regarding her degree of certainty, the defense made no objection to her qualifications as an expert or to the admissibility of her testimony.

At the close of the evidence, the jury found Mornan

7

guilty on 11 counts of mail fraud, three counts of wire fraud, and one count of conspiracy to commit mail fraud and wire fraud. The jury found Mornan not guilty on two counts of mail fraud and one count of wire fraud. The jury's verdict was entered on April 15, 2003. The Probation Office compiled a Presentence Investigation Report ("PSR") in preparation for sentencing. The PSR alleged that Mornan worked with nine co-conspirators, that the crime involved sophisticated means, that Mornan was an organizer or leader of a crime involving five or more participants, and that he was responsible for $557,305.00 in losses to 752 victims. Defense counsel filed timely objections to these allegations.

The District Court held a sentencing hearing on January 29, 2004, and found that the factual allegations in the PSR were established by a preponderance of the evidence. In accordance with the United States Sentencing Guidelines, the District Court applied a 24-level increase to Mornan's base offense level of 6. This raised his Guidelines sentencing range from 0-6 months to 97-121 months. The District Court sentenced Mornan to a prison term of 120 months, to be followed by three years of supervised release. The court also ordered Mornan to pay $145,464.90 in restitution and imposed a special assessment of $1,500.00.

## II. JURISDICTION

Pursuant to 18 U.S.C. § 3231, the District Court properly exercised subject matter jurisdiction over the federal criminal charges arising under 18 U.S.C. §§ 371, 1341, and 1343. Mornan filed a timely Notice of Appeal on February 6,

8

2004, and this Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## III. ANALYSIS

Mornan raises four issues on appeal: the admissibility of Althea Burton's prior statement; the admissibility of Kirsten Jackson's expert testimony; the sufficiency of evidence adduced at trial to sustain a judgment of conviction; and the propriety of his sentence under the Sixth Amendment.[2]  We will address each of these issues in turn.

A.    Admissibility of Burton's Prior Statement

1.    *Standard of Review*

"To the extent that our review of the District Court's determination implicates its interpretation of the Federal Rules of Evidence, our review is plenary, but where the District Court's ruling was 'based on a permissible interpretation of a rule,' we review only for an abuse of

---

[2] In his initial brief to this Court, Mornan raised a fifth issue, claiming that the Government's trial exhibits were never properly admitted into evidence and thus should not have been shown to the jury.  However, the Government submitted a Supplemental Appendix including portions of the trial transcript wherein the court properly admitted the Government's exhibits into evidence without objection.  Accordingly, Mornan expressly abandoned this issue in his Reply Brief.

discretion." United States v. Peppers, 302 F.3d 120, 137 (3d Cir. 2002) (quoting United States v. Console, 13 F.3d 641, 656 (3d Cir. 1993)).

>    2.    *Discussion*

Although the District Court admitted Burton's September 2001 statement as a prior inconsistent statement under Rule 801(d)(1)(A), both parties seem to agree that Rule 803(5) "is the better of the two proffered grounds for admissibility." (Brief for Appellee at 33, n.7.) The parties therefore focus their arguments on the statement's admissibility as a past recollection recorded, and we will address that issue first.

>    a.    Analysis under Fed. R. Evid. 803(5)

We agree with Mornan that Burton's prior statement did not meet the requirements of Rule 803(5) because Burton neither adopted nor reviewed the statement prior to her purported memory loss. The hearsay exception under Rule 803(5) provides:

> Recorded recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, *shown to have been made or adopted by the witness* when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but

10

> may not itself be received as an exhibit unless offered by an adverse party.

Fed. R. Evid. 803 (emphasis added). This rule requires the witness to have either made the record herself, or to have reviewed and adopted the statement, at a time when the matter it concerned was fresh in her memory. See 5-803 Weinstein's Federal Evidence § 803.07[d] ("A memorandum written by another is admissible as the witness's recorded recollection if the witness can testify (1) that the witness checked the memorandum when the matter it concerned was fresh in his or her memory, and (2) that the witness then knew it to be correct."). Where, as here, the statement was recorded by someone other than the declarant, accuracy may be established through the testimony of the person who recorded the statement. United States v. Booz, 751 F.2d 719, 725 (3d Cir. 1971).

In this case, the recording was made by a typist and attested to by an "official examiner" in Canada, and the Government did not show that Burton either reviewed or adopted the examiner's recording. She testified that she could not remember if she reviewed the statement, and the writing does not bear Burton's signature to indicate that she reviewed it and attested to its accuracy at the time the record was made. Burton also could not attest to the accuracy of her statement during her current testimony. Although she remembered being placed under oath before giving the September 2001 statement, when asked whether the recording was accurate, Burton replied, "I don't know that for certain, but I would hope so." (App. at 805.) Moreover, the Government did not

11

call the official examiner as a witness to establish that the recording accurately reflected Burton's oral statement.

The Government attempts to establish accuracy in this case by pointing to various indicia of reliability, such as the fact that Burton was under oath and was promised that the statement would not be used against her. The Government relies on the Sixth Circuit's decision in United States v. Porter, 986 F.2d 1014 (6th Cir. 1993), and the Second Circuit's decision in Parker v. Reda, 327 F.3d 211 (2d Cir. 2003), for the proposition that "Rule 803(5) does not specify any particular method of establishing the knowledge of the declarant nor the accuracy of the statement." Porter, 986 F.2d at 1017; see also Parker, 327 F.3d at 214. However, Porter and Parker are distinguishable from this case because the Government did not show that Burton made, reviewed, or adopted the statement at issue here. In Porter, the witness reviewed and signed the written statement at issue on each page, 986 F.2d at 1017, and in Parker, the witness wrote and signed the statement himself, 327 F.3d at 213.

The indicia of reliability to which the Government points may support the position that Burton spoke truthfully in September 2001, but the Government has not established – through Burton's current testimony, the testimony of the "official examiner," or Burton's signature on the writing – that the written recording read to the jury was either made or adopted by Burton, as is expressly required by Rule 803(5). The District Court therefore correctly held that Rule 803(5) does not apply to Burton's September 2001 statement.

12

b.       Analysis under Fed. R. Evid.
801(d)(1)(A)

Although we will not rely on Rule 803(5) to affirm the
District Court's admission of Burton's prior statement, we
will affirm the court's decision to admit the statement under
Fed. R. Evid. 801(d)(1)(A).  That rule provides that a
witness's prior statement is not considered hearsay where:

> The declarant testifies at the trial or hearing and is
> subject to cross-examination concerning the statement,
> and the statement is (A) inconsistent with the
> declarant's testimony, and was given under oath
> subject to the penalty of perjury at a trial, hearing, or
> other proceeding, or in a deposition. . . .

Fed. R. Evid. 801(d)(1).  That Burton's September 2001
statement was given under oath at a prior deposition and that
she was subject to cross-examination during her current
testimony is not in dispute.  Mornan argues on appeal,
however, that the prior statement was not actually inconsistent
with Burton's current testimony.  See United States v.
Palumbo, 639 F.2d 123, 128 n.6 (3d Cir. 1981) ("lack of
memory as to the substance of a prior statement may not be
inconsistent in certain circumstances with the prior
statement.").

We agree with Mornan that a witness's lack of memory
regarding a prior statement is not diametrically opposed to the
substance of that statement.  However, inconsistency under
Rule 801(d)(1)(A) is not limited to diametrically opposed

13

statements.  See 5-801 Weinstein's Federal Evidence § 801.21[2][b] ("A witness's statement that he or she has no recollection of the subject may be treated as 'inconsistent' with a former statement concerning the now-forgotten matter.").  Although this Court noted in Palumbo, 639 F.2d at 128 n.6, that a prior statement should not be admitted if the witness's current memory loss regarding that statement is genuine, we join several other circuits in holding that a prior statement may be admitted under Rule 801(d)(1)(A) *where the witness's memory loss is not genuine*.  See, e.g., United States v. Bigham, 812 F.2d 943, 946-47 (5th Cir. 1987) (prior grand jury testimony is admissible where the witness "was obviously an evasive and reluctant witness, and the trial judge reasonably could have concluded that his loss of memory was feigned"); United States v. Williams, 737 F.2d 594, 608 (7th Cir. 1984) (in the context of a recalcitrant witness, lack of memory is inconsistent with detailed grand jury testimony); United States v. Thompson, 708 F.2d 1294, 1302 (8th Cir. 1983) ("The district court should have considerable discretion to determine whether evasive answers are inconsistent with statements previously given."); see also United States v. Owens, 484 U.S. 554, 565 (1988) ("It would seem strange . . . to assert that a witness can avoid introduction of testimony from a prior proceeding . . . by simply asserting lack of memory of the facts to which the prior testimony related.").

In this case, the District Court acted within its discretion when it found that Burton's purported lack of memory was not genuine.  (See App. at 383.)  Burton claimed that her memory loss was caused by a relatively minor automobile accident that occurred in August 2002.  After the

14

accident, she was not hospitalized, and she was never treated for memory loss. She was never given any medication stronger than Tylenol 3 for her head and neck injuries. Moreover, Burton testified that she was aware that her cousin, Michael Williams, had been indicted for his alleged role in the fraud, that she is close to her cousin, and that she had a "family meeting of sorts" with Williams' sister the night before giving her videotaped testimony. (App. at 801.) Given the circumstances surrounding Burton's testimony, "[t]he district court reasonably could have concluded that this selective memory loss was more convenient than actual." Bigham, 812 F.2d at 947. We therefore find no abuse of discretion in the admission of Burton's September 2001 statement as a prior inconsistent statement under Rule 801(d)(1)(A).

B.      Admissibility of Jackson's Expert Testimony

1.      *Standard of Review*

Where a defendant fails to object to the admission of evidence (including expert testimony) during trial, this Court reviews the decision to admit that evidence for plain error. United States v. Adams, 252 F.3d 276, 278-79 (3d Cir. 2001) (citing Johnson v. United States, 520 U.S. 461 (1997)); United States v. Watson, 260 F.3d 301, 306 (3d Cir. 2001); see also Fed. R. Crim. P. 52(b). This Court recently explained our role in exercising plain error review:

> Under plain error review, we may grant relief if (1) the District Court committed an "error," (2) it was "plain,"

and (3) it affected "substantial rights" of the defendant. United States v. Olano, 507 U.S. 725, 732 (1993). "A deviation from a legal rule is [an] 'error.'" United States v. Russell, 134 F.3d 171, 180 (3d Cir. 1998) (citation omitted). It is "plain" when "'clear' or 'obvious.'" Id. (citation omitted). In order for an error to affect "substantial rights," it must have been "prejudicial"; in other words, "it must have affected the outcome of the district court proceedings." Olano, 507 U.S. at 734. If these requirements are satisfied, we should exercise our discretion to grant relief if the error "'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" Id. at 736 (citation omitted); see also Adams, 252 F.3d at 284-85.

United States v. Plotts, 359 F.3d 247, 249 (3d Cir. 2004).

2.    *Discussion*

An expert witness may be permitted to testify regarding "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. In order to qualify as expert testimony under the Federal Rules, the following three requirements must be satisfied: (1) the testimony must be "based upon sufficient facts or data"; (2) the testimony must be "the product of reliable principles and methods"; and (3) the witness must have "applied the principles and methods reliably to the facts of the case." Id. This Court has previously held that handwriting analysis in general is sufficiently technical in nature to be the subject of

16

expert testimony under Rule 702 and the standard articulated by the Supreme Court in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). United States v. Velasquez, 64 F.3d 844, 850-51 (3d Cir. 1995). The issue here is thus whether Jackson's testimony in particular was sufficiently detailed and reliable to be helpful to the jury.

We are mindful that "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine. " Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). Deference to the trial judge is particularly warranted where the defendant does not object to the admissibility of the expert's testimony. Under Rule 702 and the Supreme Court's ruling in Daubert, the District Court has an obligation to evaluate the reliability of expert testimony "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question," Kumho Tire, 526 U.S. at 149. However, where the opposing party does not sufficiently call these issues into question, we will not find plain error merely because the District Court did not conduct an extensive Daubert analysis on the record. See Macsenti v. Becker, 237 F.3d 1223, 1231-32 (10th Cir.2001) ("Daubert does not mandate an inquiry questioning and challenging the scientific proffer absent a timely request by an objecting party."); Hoult v. Hoult, 57 F.3d 1, 4-5 (1st Cir.1995) ("We do not think, however, that district courts are required, sua sponte, to make explicit on-the-record rulings regarding the admissibility of expert testimony."); see also United States v. Evans, 272 F.3d 1069,1094 (8th Cir.2001) ("There is no requirement that the

17

District Court always hold a <u>Daubert</u> hearing prior to qualifying an expert witness. . . .”).

In this case, Jackson explained her qualifications, her methodology, the bases for her conclusions, and the degrees of certainty with which she was able to reach her conclusions. Mornan nevertheless challenges the admissibility of her testimony based on the answer to one question on cross-examination. When the defense attorney asked Jackson whether her opinions were rendered to a “reasonable degree of scientific certainty,” she replied, “I think they are.” (App. at 455.) As the Government has pointed out, however, “there is nothing magical about the phrase, ‘to a reasonable degree of scientific certainty.’” (Brief for Appellee at 52.) It is not derived from the language of Rule 702 itself, and this Court has been unable to find any authority to support the position that questions regarding the expert’s “degree of scientific certainty” categorically renders expert testimony inadmissible.

Handwriting experts often give their opinions in terms of probabilities rather than certainties. <u>See, e.g.</u>, <u>United States v. Rosario</u>, 118 F.3d 160, 163 (3d Cir. 1997) (considering a handwriting expert’s testimony that the defendant “probably” authored a forged check in affirming a forgery conviction); <u>United States v. McGlory</u>, 968 F.2d 309, 346 (3d Cir. 1992) (handwriting testimony is admissible “even if the handwriting expert is not absolutely certain that the handwriting is that of the defendant.”); <u>United States v. Galvin</u>, 394 F.2d 228, 229 n.1 (3d Cir. 1968) (handwriting testimony is not rendered inadmissible merely “because it

18

expresses a probability"). Indeed, Jackson testified that rendering "less-than-certain" opinions is an accepted practice in her field.[3] We therefore find no error (let alone a plain error) in the District Court's decision to allow Jackson's testimony and to allow the jury to determine what weight to give her "less-than-certain" conclusions. See McGlory, 968 F.2d at 346 ("Any issue regarding the certainty of [the handwriting expert's] testimony goes to the weight given that testimony and could be tested by cross-examination.");

---

[3] Jackson's practice of giving opinions along a "continuum," is very similar to the practice commonly implemented by document examiners, as described by this Court in Rosario:

> "Probable" is a term of art used by Secret Service document examiners. The "probable" category falls exactly in the middle of the six-point spectrum between "positive identification" and "positive elimination." Thus, handwriting experts will use the term "probable" to describe times when the evidence falls considerably short of the "virtually certain" category and yet still points rather strongly toward the suspect, i.e., there are several significant similarities present between the questioned and known writings, but there are also a number of irreconcilable differences and the examiner suspects that they are due to some factor but cannot safely attribute the lack of agreement to the effect of that factor.

118 F.3d at 163

Galvin, 394 F.2d at 229 n.1 ("reservations in the expressed opinion . . . go to the weight of the evidence and are a determination for the jury or fact-finder to make. . . .").

## C.    Sufficiency of the Evidence

### 1.    *Standard of Review*

Where, as here, a defendant does not preserve the issue of sufficiency of the evidence by making a timely motion for judgment of acquittal at the close of the evidence, this Court reviews the sufficiency of the evidence for plain error. United States v. Wolfe, 245 F.3d 257, 260-61 (3d Cir. 2001); United States v. Gaydos, 108 F.3d 505, 509 (3d Cir. 1997); see also Fed. R. Crim. P. 52(b). In conducting plain error review, we "view the evidence in the light most favorable to the government and must sustain a jury's verdict if 'a reasonable jury believing the government's evidence could find beyond a reasonable doubt that the government proved all the elements of the offenses.'" Rosario, 188 F.3d at 163 (quoting United States v. Salmon, 944 F.2d 1106, 1113 (3d Cir. 1991)). This places a "very heavy burden" on the appellant. Id. (quoting United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995)).

### 2.    *Discussion*

In this appeal, Mornan challenges the sufficiency of the evidence to sustain his conspiracy conviction, essentially claiming that the evidence offered at trial revealed "that Mornan was merely an employee in this scheme" rather than a willing participant in a conspiracy to defraud. (Brief for

20

Appellant at 40.) However, viewing the evidence adduced at trial in the light most favorable to the Government, that evidence suggested that Mornan was much more than an employee.

First, Mornan himself admitted to the police that he was an office manager at the Sun Corp. offices in 1998. Second, the police found a list of United States newspapers on Mornan's desk at Sun Corp., from which a jury could infer that he had at least some responsibility for placing the misleading advertisements that were at the heart of this scheme. Finally, the Government produced evidence and testimony tending to show that Mornan himself leased office space, rented mailboxes, received mail, and cashed money orders on behalf of the sham companies that were set up to carry out the scheme. A reasonable jury believing this evidence could certainly find beyond a reasonable doubt that Mornan was guilty of wire fraud, mail fraud, and conspiracy. We will therefore affirm his conviction.

D.     Mornan's Sentencing Challenge

As noted, Mornan received substantial enhancements to his sentence based on facts not alleged in the indictment, proven to the jury beyond a reasonable doubt, or admitted by the defendant. Under a mandatory Guidelines system, this would clearly constitute a violation of Mornan's rights under the Sixth Amendment as interpreted by the Supreme Court in Booker, 543 U.S. __, 125 S. Ct. 738. Therefore, having concluded that sentencing issues that arise in light of the Booker decision are best determined by the District Court in

21

the first instance, <u>United States v. Davis</u>, 407 F.3d 162, 165-66 (3d Cir. 2005) (en banc), we will vacate the sentence and remand for re-sentencing.