NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2648
_____

UNITED STATES OF AMERICA

v.

MOHAMMAD REZA VAGHARI,
Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Crim. No. 08-cr-00693-001)
District Judge:  Honorable Jan E. Dubois
_____

Submitted Under Third Circuit LAR 34.1(a)
September 13, 2012
_____

Before: SCIRICA, ROTH and BARRY, Circuit Judges

(Opinion Filed:  October 4, 2012)
_____

OPINION
_____

BARRY, Circuit Judge

Mohammad Vaghari ("Vaghari"), an Iranian citizen who resided in Pennsylvania

prior to his arrest, appeals from his conviction for conspiracy to violate the International

Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701, *et seq.*, and three

related counts arising from his scheme to illegally export various goods and technology to Iran. We will affirm.

## I. Background

IEEPA grants the President of the United States the authority, upon the declaration of a national emergency caused by a foreign threat, to "prevent or prohibit any . . . importation or exportation of . . . any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B). Pursuant to this statute, successive Presidents have long imposed a comprehensive trade embargo on Iran. In addition to banning the export of goods and technology directly to Iran from the United States, the embargo prohibits so-called "transshipping," whereby goods are exported to a friendly country and then re-routed to Iran. It is unlawful for any person to "violate . . . any license, order, regulation, or prohibition issued under [IEEPA]," and violators are subject to up to twenty years in prison. 50 U.S.C. § 1705.

Vaghari first came to the attention of law enforcement officials in July 2005 after the FBI received a tip from a salesman at a U.S.-based company called Beckman Coulter, which specializes in the manufacture of centrifuges. That salesman, Thomas Frantz ("Frantz"), had been contacted by Vaghari about the purchase of a $100,000 centrifuge. During several subsequent phone conversations, Vaghari said that he would make the purchase in cash, and asked that the centrifuge, which weighed 1,100 pounds, be delivered to his basement apartment. He also said that he was "a middleman" who was purchasing the centrifuge for someone else, but refused to identify the end-user. When

2

Frantz informed him that Beckman Coulter would not make the sale without knowing the identity of the end-user, Vaghari ceased all contact. Based on these conversations, Frantz became suspicious and contacted the FBI.

Acting on this tip, two FBI agents visited Vaghari at his apartment on October 28, 2005. The agents spoke with Vaghari about the company he founded, Saamen Company LLC, which he described as an import/export business specializing in shipping goods to Dubai. In response to the agents' questions, Vaghari stated that he did not export anything to Iran and knew that doing so was illegal. As the agents were leaving, they asked Vaghari if they could take with them certain documents from his home office so that they could better understand his business, and a consent search ensued. Upon being translated and reviewed, these documents revealed a scheme in which Vaghari received orders for American-based goods from contacts in Iran, purchased the goods himself, and then transshipped them to customers in Iran via Dubai. On the basis of this information, a search warrant for Vaghari's apartment was obtained. On December 13, 2005, federal agents executed the warrant and removed ten boxes of documents, files, and other items.[1]

On September 16, 2010, a grand jury returned a superseding indictment against Vaghari and a co-conspirator, Mir Hossein Ghaemi. Count One charged Vaghari with conspiracy to violate IEEPA, and Counts Two through Four charged substantive violations of IEEPA. Vaghari also was charged with naturalization fraud, in violation of

---

[1] During this search, the FBI was unable to locate any documents related to Saamen Company on Vaghari's computer, as the hard drive had been replaced five days after the agents' initial visit. One week later, the FBI obtained a search warrant for Vaghari's e-mail account, only to discover that all e-mails had been deleted from the account.

3

18 U.S.C. § 1425 (Count Five), and possessing a green card procured by fraud, in violation of 18 U.S.C. § 1546 (Count Six). Vaghari moved to suppress the documents recovered in the initial search on the ground that his consent had not been voluntarily given. He further argued that because the warrant for the second search was obtained based on information obtained from the documents, that search, too, was tainted. The District Court held a day-long hearing and subsequently denied the motion in a detailed written opinion.

The case proceeded to trial. During its case-in-chief, the government called 42 witnesses and introduced some 220 documents into evidence. The defense also presented a case, during which Vaghari testified. Following lengthy closing arguments, discussed in greater detail below, the jury deliberated for eight days, eventually returning a verdict finding Vaghari guilty on Counts One, Two, Three, and Five. At sentencing, the District Court applied a two-level enhancement for obstruction of justice based on its finding that Vaghari perjured himself during his trial testimony. Vaghari was sentenced to 33 months' imprisonment, and appealed. We will address each of the numerous issues Vaghari has raised to us on appeal.

## II. Discussion[2]

### A. Prosecutorial Misconduct

Vaghari argues, first, that he was denied his right to a fair trial because of three types of prosecutorial misconduct: (1) excessive and inflammatory references to his

---

[2] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

statements and acts as "lies"; (2) vouching for government witnesses; and (3) arguing during closing facts not supported by the evidence. Because Vaghari did not raise a contemporaneous objection to the first two types of purported misconduct, our review is for plain error. Fed. R. Crim. P. 52(b); *United States v. Bethancourt*, 65 F.3d 1074, 1079-80 (3d Cir. 1995). He did object to the prosecution's closing argument on the ground that it relied on facts not in evidence, an objection which was overruled. We review that ruling for abuse of discretion. *United States v. Brown*, 254 F.3d 454, 458 (3d Cir. 2001). If prosecutorial misconduct did occur, we apply the harmless error standard in the context of the record as a whole. *United States v. Helbling*, 209 F.3d 226, 241 (3d Cir. 2000).

### 1. Excessive and Inflammatory Argument

Vaghari argues that the government's opening and closing arguments were improper insofar as they repeatedly referred to various of his statements and actions as "lies." He concedes that "[u]se of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper," (Appellant's Br. 19), but argues that the government's comments on his credibility were so excessive and inflammatory that he was denied a fair trial. Specifically, he points out that the government used the word "lie"—or some derivation thereof—approximately twenty times during its opening statement and sixty or more times during its opening and rebuttal summations.

Although "the adversary system permits the prosecutor to prosecute with earnestness and vigor," attorneys also have a "duty to refrain from overzealous conduct."

5

*United States v. Young*, 470 U.S. 1, 7 (1985) (citation and internal quotations omitted).

"In other words, while [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones." *Id.* Where, as here, a prosecutor describes a defendant's statements as "lies" during argument to the jury, courts must determine whether such statements exceed the bounds of acceptable advocacy. In considering this question, we have held that it is not improper for a prosecutor to refer to a defendant's testimony as "lies" so long as this characterization is "a fair comment on the evidence adduced at trial" and not an "inflammatory expression of a prosecutor's personal belief." *United States v. Reilly*, 33 F.3d 1396, 1421 (3d Cir. 1994) (citation and internal quotations omitted). Applying this standard, we conclude that although the "blows" inflicted by the government were both frequent and hard, they were not foul.

As an initial matter, the government's focus on Vaghari's misrepresentations was warranted, as this case turned on his credibility. The very essence of Counts Five and Six was that Vaghari lied on his naturalization form and green card application, respectively. As to the IEEPA violations charged in Counts One through Four, the keys to avoiding detection and a successful scheme were Vaghari's misrepresentations, on shipping forms and in statements to federal agents, that the goods were intended for delivery to Dubai and not Iran. Indeed, this was Vaghari's primary defense at trial, and he testified—in the face of extensive circumstantial evidence to the contrary—that the goods he shipped overseas were "supposed to go to Dubai and stay in Dubai." (J.A. 3433.) The jury therefore was faced with a stark choice: either accept Vaghari's story and acquit him of

6

the charges, or reject this explanation as not credible and find him guilty. Because so much hinged on the jury's view of Vaghari's credibility, the prosecution was justified in emphasizing credibility issues in its arguments to the jury.

Nor is the number of references to "lies" or "lying," standing alone, proof of prosecutorial misconduct. This is especially true here, where the government gave a three and one-half hour opening summation and an hour-long rebuttal. In the context of this marathon argument, the government's remarks about Vaghari's credibility were neither pervasive nor overly repetitious, and the sheer number of times the word "lies" was mentioned cannot be viewed as indicative of improper argument. *See United States v. Rude*, 88 F.3d 1538, 1548 (9th Cir. 1996) (holding that prosecutor's use of the words "lie," "lies," or "lied" more than ninety times was not improper when viewed "in the context of the month-long trial"). Moreover, these repeated references to "lies" or "lying" were justified by the record evidence, which indicated that Vaghari lied not only about his intention to export goods to Iran, but about myriad other topics reflecting on his character for truthfulness.[3]

In sum, the prosecution's arguments were vigorous, forceful, and at times colorful, but they were not unfair. As one of our sister circuits has stated:

"Lies" and "lying" are hard words. But this was closing argument, not a

---

[3] Pursuant to Federal Rule of Evidence 608, the government adduced evidence indicating that, among other things, Vaghari had lied under penalty of perjury on an application for Social Security benefits, misrepresented his employment status when obtaining a traveler's visa to Canada, submitted an application to the University of Pennsylvania Dental School that was rife with falsehoods, and obtained health insurance through his uncle's business even though he was not an employee.

7

polite social conversation. . . . [The prosecutor] could have told the jury that the evidence proved [the defendant] had been "untruthful," or that she "fabricated her testimony," or "prevaricated," or that she "bore false witness," "made up her story," "is not to be believed," "violated her oath." These and many other words and phrases would have conveyed the same idea as "lie" and "lying," perhaps not as forcefully, or, depending on the prosecutor's rhetorical skill, perhaps more forcefully. Still, is there any reason in law why the words "lie" and "lying" should be banned from the vocabulary of summation, particularly in cases that turn on the defendant's credibility? We conceive of none, so long as the prosecutor sticks to the evidence and refrains from giving his personal opinion.

*United States v. Dean*, 55 F.3d 640, 665 (D.C. Cir. 1995). We reject the contention that the government's references to Vaghari's "lies" denied him a fair trial.

## 2. Vouching

Vaghari also argues that it was improper witness vouching when during closing argument the prosecutor posed the following rhetorical questions related to the testimony of Frantz, the salesman at Beckman Coulter who testified for the government: "Why would Tom Frantz lie to you? What's Tom Frantz getting out of lying to you?" (J.A. 4056.) We need not dwell on this argument, as it is squarely foreclosed by *United States v. Walker*, 155 F.3d 180 (3d Cir. 1998). In *Walker*, the prosecutor stated during closing: "Now ask yourselves what motivation would officer Robert Scott and former Officer Raymond Dubois have to come in here and lie to you. What motivation." *Id.* at 188. We flatly rejected the appellant's assertion that this constituted vouching, stating:

The comment by the AUSA consists first of the rhetorical question, "What motivation [would these witnesses have to lie]?" This question is not vouching. It does not maintain the credibility of the two witnesses by referring to information outside the record, nor does it contain a personal assurance of veracity.

8

*Id.* The prosecutor's comments here were nearly identical to the AUSA's comment in *Walker*, and Vaghari has made no attempt to distinguish *Walker*. Under our precedent, then, there was no impermissible vouching.

### 3. Arguing Facts Not in Evidence

Finally, Vaghari contends that the government "ma[de] up facts" during its summation when it accused him of orchestrating a sham photo opportunity in an effort to make it appear that items sent to Iran actually remained in Dubai. (Appellant's Br. 21.) This claim stems from the testimony of Joseph Gill, a private investigator and defense witness in this case, who testified that Vaghari had hired him to travel to Dubai with the object of photographing some of the items that Vaghari had shipped, so as to prove that those items were not intended for transshipment to Iran. Gill did so, and the photographs, which showed several pieces of laboratory equipment arranged on a table in a Dubai hospital, were introduced into evidence by the defense. Defense counsel argued to the jury that "Mr. Gill's investigation prov[es] to an absolute certainty" that the goods shipped to Dubai by Vaghari were intended to remain there and did, in fact, remain there.

In its closing argument, however, the government dismissed Gill's photographs, arguing that the display of lab equipment at the hospital in Dubai was merely a set-up devised by Vaghari to make it appear that the equipment was never sent to Iran. The government pointed to a sales invoice for the equipment, recovered from Vaghari's apartment, which identified the buyer as the Pasteur Institute of Iran in Tehran and specified that "[t]he delivery location will be the Pasteur Institute of Iran." (Supp. App.

9

3.) Additionally, although the equipment was photographed at a Dubai hospital, it was not properly assembled and there was no sign of test animals at the hospital, even though the equipment was designed exclusively for animal testing. The defense objected to the government's suggestion that the display of the lab equipment was a set-up, accusing the government of "making up a story that has no basis in the evidentiary record in this case." (J.A. 4049.) The District Court agreed that there was "no direct evidence" of a set-up, but overruled the objection because "[t]here is circumstantial evidence that the Government is arguing." (J.A. 4050.)

"Although counsel may state his views of what the evidence shows and the inferences and conclusions that the evidence supports, it is clearly improper to introduce information based on personal belief or knowledge." *United States v. Zehrbach*, 47 F.3d 1252, 1265 n.11 (3d Cir. 1995) (en banc). Nonetheless, prosecutors are "entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." *United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991). Even if a prosecutor goes too far, however, "[p]rosecutorial misconduct does not always warrant the granting of a mistrial." *Zehrbach*, 47 F.3d at 1265. Rather, we must weigh the challenged remarks under a harmless error standard and should reverse only "if we conclude that the prosecutor's remarks, taken in the context of the trial as a whole, prejudiced the defendants." *Id.*

The evidence shows that the lab equipment in question was destined for Tehran, and surfaced in Dubai just in time to be photographed by Vaghari's investigator. It was

10

not unreasonable for the government to make an argument as to the authenticity of the display, especially given that the equipment was completely disconnected and not in use at the time it was photographed. The District Court did not abuse its discretion when it concluded that the government had not argued facts for which there was no record support.

However, even if the government's closing argument contained an overstatement of the record, it was not one that was likely to substantially prejudice Vaghari in the eyes of the jury. In response to defense counsel's repeated objections, the District Court provided clarifying instructions to the jury on at least three occasions, including the following:

> Defense counsel argues that the statements that were just made by Government counsel are not in evidence. It's for you to recall whether there is evidence on the subject about which Government counsel just spoke, you and you alone. So if you feel—in your recollection, your collective recollection is that there is no such evidence, disregard the argument.

(J.A. 4038-39; *see also* J.A. 4044, 4050.) The Court reiterated this point in its final jury charge:

> Although counsel may have called your attention to certain facts or factual conclusions that they thought were important, what counsel said is not evidence and is not binding on you. It [is] your recollection and interpretation of the evidence that controls your decision in this case.

(J.A. 4220.) Such "extensive cautioning by the court" may cure a prosecutor's error, *Zehrbach*, 47 F.3d at 1267, and surely cured any error here.

11

## B. Evidentiary Challenge

Vaghari next argues that he was prejudiced by the admission of irrelevant and inadmissible evidence in violation of Federal Rules of Evidence 401 and 403. We review a district court's decision to admit evidence for abuse of discretion. *United States v. Kemp*, 500 F.3d 257, 295 (3d Cir. 2007).

Vaghari's challenge is directed at the admission of printed copies of e-mails, recovered from his apartment, in which the senders request that he ship various types of goods to Iran. He first argues that these e-mails were not relevant to the charged offenses because some were sent by people who were not named in the indictment and because there was no proof that he acted on their requests. This argument is meritless. The relevance of these e-mails to the charged conspiracy is not undermined by the fact that some were sent by individuals who were not named in the indictment, as the indictment charged a conspiracy involving Vaghari, Ghaemi, and "others known and unknown to the grand jury." (J.A. 77.) Moreover, it is self-evident that any communication between Vaghari and his co-conspirators about items for customers in Iran is relevant to the charge that Vaghari and others conspired to ship items to customers in Iran. As we have stated, "Rule 401 does not raise a high standard," *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009), and the District Court did not abuse its discretion in ruling that this evidence was relevant to the charged offenses.

Vaghari's challenge under Rule 403 is similarly unpersuasive. Under Rule 403,

12

evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* at 215. Vaghari argues that these e-mails were unfairly prejudicial because their effect "was to mislead the jury into believing that [he] had engaged in substantially more transactions than he actually had." (Appellant's Br. 28.) Contrary to Vaghari's assertion, this would *not* lead to unfair prejudice because the number of transactions is beside the point. The real question is whether Vaghari and his contacts overseas were conspiring to illegally export items to Iran, and the e-mails in question are certainly evidence of such a scheme. While the admission of these e-mails may have been damaging to Vaghari's case, "the fact that probative evidence helps one side prove its case obviously is not grounds for excluding it under Rule 403." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). The District Court did not abuse its broad discretion in ruling as it did.

## C. Challenges to Conviction on Count Five

Vaghari argues that there was insufficient evidence of the *mens rea* required for a conviction on Count Five. Specifically, Vaghari was charged with falsely stating on his application for naturalization that he had never committed a crime for which he had not been arrested, when in fact he knew that his ongoing scheme to export goods to Iran via Dubai was a crime. The evidence, he argues, was insufficient to prove that he *knew*, at the time he filed for citizenship in July 2005, that transshipping items to Iran was a crime.

Because Vaghari did not file a Rule 29 motion as to Count Five, we review his sufficiency challenge under a plain error standard. *United States v. Gordon*, 290 F.3d

13

539, 547 (3d Cir. 2002). In this inquiry, we view the evidence in the light most favorable to the prosecution, and must sustain the verdict so long as "any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Wolfe*, 245 F.3d 257, 261 (3d Cir. 2001). "This places a very heavy burden on the appellant." *United States v. Mornan*, 413 F.3d 372, 382 (3d Cir. 2005) (citation and internal quotations omitted).

Vaghari's sufficiency challenge ignores substantial evidence in the record indicating that he knew his exporting activities were illegal. Most significantly, he took the stand at trial and testified that he knew "it [was] illegal" to export items to Iran via Dubai as far back as November 2002. (J.A. 3448.) This unqualified admission leaves no doubt that he was well aware of the unlawfulness of transshipping goods to Iran. He asserts, however, that even if there was sufficient evidence to prove that he knew that transshipping goods to Iran was "*unlawful*" or "*illegal*," there was no evidence that he knew that such transshipment was a "*crime*," which is the question asked on the naturalization application. Vaghari points out that IEEPA provides for both civil and criminal penalties, 50 U.S.C. § 1705, and argues that it cannot be presumed that he knew his IEEPA violations were "criminal" in the sense that they "would subject him to criminal penalties." (Appellant's Br. 48.)

Vaghari does not identify any authority recognizing the distinction he draws between knowledge of "illegality" and knowledge of "criminality," nor are we aware of any such authority. That aside, it strains credulity that Vaghari, an Iranian national who

14

established, built, and operated a business devoted to exporting goods to the Middle East, would not know that transshipping goods to Iran was a crime. Indeed, the prosecution introduced evidence indicating that Vaghari had actively gathered information regarding the laws and regulations governing the export of goods to Iran in an effort to clarify the exact parameters of these rules. For example, recovered from his apartment were handwritten notes referencing specific provisions of the Export Administration Regulations, 15 C.F.R. §§ 730-774, as well as the phone number for the Foreign Trade Division of the Department of Commerce ("DOC") and the URL address of the DOC website listing foreign trade schedules. Viewing all of this evidence in the light most favorable to the prosecution, we are convinced that a reasonable juror could conclude that Vaghari knew that transshipping goods to Iran was a crime and that he therefore possessed the *mens rea* required for a violation of § 1425(a). Not having carried the "very heavy burden" of showing that his conviction was a "fundamental miscarriage of justice," Vaghari's sufficiency challenge fails.

### D. Motion to Suppress

Vaghari argues, next, that the District Court erred in denying his motion to suppress. The FBI searched Vaghari's apartment on two occasions relevant here: first, on October 28, 2005, pursuant to his consent; and second, on December 13, 2005, pursuant to a search warrant. Vaghari challenges the first search on the ground that his consent was not freely given, and argues that the second search was likewise tainted because the warrant relied entirely on evidence seized during the initial search. We reject these

15

challenges.

Whether consent to a search was voluntarily given is a question of fact that we review for clear error. *United States v. Price*, 558 F.3d 270, 278 n.7 (3d Cir. 2009). The government bears "the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). For consent to be voluntary, it cannot be "the product of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S 218, 227 (1973). But because there is "no talismanic definition of 'voluntariness,'" we must look to the totality of the circumstances in determining whether consent was voluntary. *Id.* at 224. We recently described what such an inquiry entails:

> Factors to consider include: the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment. We have further identified as relevant the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions.

*Price*, 558 F.3d at 278 (citation and internal quotations omitted).

Applying this framework, we conclude that the District Court's voluntariness determination was not clearly erroneous. First, Vaghari is a college-educated adult intelligent enough to have founded and operated his own export company. Although he is an Iranian citizen, there is nothing to suggest that his consent resulted from any language barrier, as he speaks English proficiently and did not require an interpreter at trial. Second, the entire visit to the apartment lasted just thirty minutes, so Vaghari's

16

assertion that the agents "questioned him for a lengthy period of time" is simply not supported by the record. (Appellant's Br. 51.) Third, the evidence at the suppression hearing indicated that the agents' interaction with Vaghari was not coercive. To the contrary, one of the agents provided uncontroverted testimony, which the District Court deemed credible, that Vaghari was friendly and forthcoming throughout their meeting. Fourth, Vaghari was never arrested, handcuffed, or even touched, and the agents neither threatened nor promised anything to him. And fifth, the fact that the encounter took place during daylight hours on Vaghari's own property is further suggestive of a low-key, non-coercive atmosphere.

Despite this abundant evidence supporting a finding of voluntariness, Vaghari asserts that his consent could not have been voluntary because the agents did not provide him with a written form indicating that he could refuse consent. This argument is squarely foreclosed by our decision in *Price*, in which we considered the defendant's argument that "the lack of a consent form, without more, means that [the defendant] consented involuntarily." 558 F.3d at 279. In rejecting such a bright-line approach, we reiterated that "'[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the Government need not establish such knowledge as the *sine qua non* of an effective consent.'" *Id.* (quoting *Schenckloth*, 412 U.S. at 227.) We concluded:

> [E]very factor, save one (that she was not advised of her right to refuse consent), favors a finding of voluntary consent. Under these circumstances, Fischer's consent was voluntary, and this is true notwithstanding that Fischer was not advised of her right to refuse consent.

17

*Id.* at 279-80.  We reach the same conclusion here.

### E.  Voir Dire Procedure

Finally, Vaghari argues that his Sixth Amendment right to a public trial was violated when the District Court held portions of the voir dire in the robing room rather than in open court.  Prior to the start of trial, the District Court and counsel discussed the procedure for individually questioning prospective jurors.  The Court recognized that while "general questions" should be heard in open court, many of the questions were likely to be "somewhat personal" and would call for responses of a "private nature."  The Court observed that "we'll want to hear [these questions] at sidebar," and proposed making use of the robing room for this purpose.  Defense counsel readily assented, stating that he had "always liked" the practice of using an anteroom for questioning individual jurors about sensitive subjects rather than "whispering at sidebar."  (Supp. App. 125-26.)  Vaghari now argues that this procedure violated his right to a public trial. We disagree.

A defendant's right to a public trial is guaranteed by the Sixth Amendment, and this right "extends to the voir dire of prospective jurors."  *Presley v. Georgia*, 130 S. Ct. 721, 724 (2010).  However, the District Court did *not* close the courtroom or explicitly exclude any member of the public from observing voir dire.  Although certain portions of the individual voir dire did take place behind "closed doors," doing so was the functional equivalent of a sidebar discussion and no more improper than that commonly accepted practice.  *See United States v. Smith*, 787 F.2d 111, 114 (3d Cir. 1986) ("[T]he public and

18

press may be justifiably excluded from sidebar and chambers conferences even when substantive rulings are made.").

This conclusion is supported by our recent decision in *United States v. Bansal*, 663 F.3d 634 (3d Cir. 2011), in which we rejected a challenge to an identical voir dire procedure, explaining:

> Bansal contends that the closed-room questioning violated the Sixth Amendment's public trial guarantee. We disagree for several reasons. First, this is classic sandbagging of the trial judge, as Bansal complains for the first time on appeal about a decision by the trial court to which he did not object at the time. Second, at no time did anyone—Bansal, the press, or the public—request access to the closed jury-room. At most, the judge prevented the members of the voir dire panel from hearing other members' responses, and we are aware of no case holding that such procedures offend the Sixth Amendment. . . . Finally, the entire jury selection process was transcribed and recorded; nothing was sealed or concealed from public view. Given these facts, we will not order Bansal a new trial on these grounds.

*Id.* at 661. The voir dire in this case played out exactly as it did in *Bansal*: defense counsel enthusiastically agreed to the voir dire procedure; no member of the public was denied access to the robing room; and all of the voir dire proceedings, including those portions that took place in the robing room, were recorded and transcribed. The transcript was not sealed and was available for public viewing. Because this case is on all fours with *Bansal*, we reject Vaghari's argument that his right to a public trial was violated.[4]

---

[4] Vaghari argues at length that a different result is compelled by the Supreme Court's *per curiam* opinion in *Presley v. Georgia*, 130 S. Ct. 721 (2010), in which the Court ordered a new trial on Sixth Amendment grounds. *Presley* is clearly distinguishable, however, as

### III. Conclusion

For the foregoing reasons, we will affirm the judgment of sentence.

---

the trial court in that case actually closed the courtroom during voir dire and ordered that the defendant's family members be removed.